NOTICE

Decision filed 11/18/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160394-U

NO. 5-16-0394

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 13-CF-2200 |
| | ) | |
| BREANNA MALDONADO, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Presiding Justice Welch and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in denying the defendant's motion to suppress her statements to police officers where she made her first incriminating statements spontaneously before police gave her the *Miranda* warnings, and where the evidence supported the court's finding that the defendant knowingly and voluntarily waived her *Miranda* rights prior to making additional statements at the police station. There was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant's actions were not justified as self-defense. The evidence supported the jury's decision to find the defendant guilty of first-degree murder and reject her claim of second-degree murder based on an actual-but-unreasonable belief that she needed to act in self-defense. The defendant did not receive ineffective assistance of counsel.

¶ 2    The defendant, Breanna Maldonado, appeals her conviction for first-degree murder. During an altercation, the defendant fatally stabbed another young woman. At

1

trial, she argued that she acted in self-defense. Alternatively, she argued that she should be convicted of second-degree murder, rather than first-degree murder, because she subjectively, but unreasonably, believed that she needed to act in self-defense. On appeal, the defendant argues that (1) the court erred in denying her motion to suppress her statements to police; (2) there was insufficient evidence to refute her claim of self-defense; (3) the evidence did not support the jury's rejection of her claim of second-degree murder; and (4) she received ineffective assistance of counsel. She contends that counsel was ineffective for (1) failing to object to the composition of the venire from which her jury was chosen on the basis of *Batson v. Kentucky*, 476 U.S. 79 (1986), and (2) failing to request an additional second-degree murder instruction on serious provocation due to mutual combat. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4     The events at issue unfolded during the early morning hours of October 6, 2013. The defendant received a text message from her friend, Antonio Carlin. He informed her that her cousin, Arnulfo Hernandez, had been injured in a fight. Carlin asked the defendant to drive him and Hernandez to the hospital for treatment, and she agreed. The defendant drove to the trailer park where Hernandez lived. Carlin and Hernandez were waiting for her, along with Carlin's friend, Holly Christian. All three got into the defendant's car, a dark-colored Mini Cooper, and she drove to the nearest hospital, Gateway Regional Medical Center in Granite City.

¶ 5     Carlin and Hernandez asked the defendant to stop at a Quick Trip across the street from the hospital so they could purchase alcohol and cigarettes. There, the defendant and

her passengers encountered Kaitlin Juenger, Hugo Valenzuela, and Luis Ortiz. Carlin and Hernandez were members of a gang called the Surenos. Valenzuela was a member of a rival gang called CV155. A heated argument broke out between the two groups over these gang affiliations. The verbal argument escalated to a fistfight, and some of the combatants also threw beer bottles. Eventually, the defendant stabbed Juenger, and Carlin stabbed Valenzuela. Juenger died of her injuries.

¶ 6    The defendant drove away from the scene. She later alleged that she did so because she was afraid that Valenzuela, Ortiz, and Juenger were going to chase her in their vehicle. She was stopped by Lt. Jeff Bridick of the Madison County Sheriff's Department several blocks from the Quick Trip. Lt. Bridick asked the defendant where she was coming from, and she told him she was coming from the Quick Trip.

¶ 7    Granite City Police Officer Carter Burford arrived on the scene almost immediately. He asked the defendant her name. After answering, she pointed out the location of the knife. Because the knife was within her reach, Officer Burford removed the defendant from the vehicle and placed her in handcuffs. As he was doing so, the defendant told him that she stabbed a woman in self-defense. Officer Burford realized he was not wearing the wireless microphone he was required to wear outside his vehicle. He retrieved the microphone from his squad car and read the defendant her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). In response to further questioning, the defendant again stated that she stabbed a woman in self-defense. She was then placed in a squad car. A recording system in the squad car recorded the defendant speaking with people on her cell phone while she waited for the officer to return to the car. During these

3

phone calls, the defendant admitted that she stabbed a girl and stated that someone tried to jump her.

¶ 8   At the police station, the defendant waived her *Miranda* rights and gave a video-recorded statement to two detectives. She admitted that she stabbed Juenger and asserted that she was acting in self-defense. She explained that Juenger and Valenzuela were throwing punches at her through the window of her vehicle, and one of them struck her in the eye. She also stated that she felt the knife strike Juenger, but she did not see any blood on it.

¶ 9   The defendant filed a motion to quash her arrest and a motion to suppress her statements to police. In the motion to quash arrest, she argued that she was stopped for the sole purpose of investigating the murder without probable cause. In the motion to suppress, the defendant first addressed the statements she made to Lt. Bridick and Officer Burford. She argued that these statements were inadmissible because the officers asked her guilt-seeking questions without giving her "the option of not answering questions or having an attorney present" under circumstances in which a reasonable person would not have felt free to leave. She also addressed the statement she gave at the police station. She argued that she was coerced into making this statement "without an understanding of her right to have counsel present before answering questions or without an understanding that she could elect not to answer questions." In support of this claim, she alleged that she was a high school student with a learning disability pertaining to reading and comprehension. We note that the defendant also challenged the admissibility of the phone

4

conversations that were recorded while she was in Officer Burford's squad car; however, she does not continue to press this issue on appeal.

¶ 10    At a motion hearing, Lt. Bridick testified that he stopped the defendant's vehicle at approximately 1:30 a.m. on October 6, 2013. At that time, he was aware that Granite City police were looking for a dark-colored Mini Cooper in connection with a stabbing that had recently occurred at a Quick Trip in Granite City because he heard "radio traffic" about the incident. Lt. Bridick testified that he stopped the defendant's vehicle approximately eight blocks south of the Quick Trip involved. He explained that he stopped the vehicle because it matched the description of the suspect vehicle and was traveling south, away from the direction of the crime scene. He testified that his purpose in stopping the vehicle was to determine whether it was the vehicle being sought by Granite City police.

¶ 11    Lt. Bridick asked the defendant a single question after stopping her vehicle; he asked where she was coming from. He did not give her the *Miranda* warnings before asking this question. The defendant indicated that she was coming from the Quick Trip. At this point, Officer Burford arrived and took over the investigation.

¶ 12    Officer Burford testified that he was dispatched to investigate a fight with a possible stabbing at a Granite City Quick Trip. He was aware that a dark-colored Mini Cooper was a suspect vehicle. He heard over his radio that Lt. Bridick had stopped a vehicle matching the description of the suspect vehicle, so he drove to the location of the stop. By this point, he was aware that at least one person had been stabbed during the incident and that there was a suspect named Breanna Maldonado.

5

¶ 13   Officer Burford approached the vehicle and asked the defendant to identify herself. He testified that the defendant told him her name, and then immediately, before he could ask her any more questions, she "mentioned that there was—there was a knife, and she pointed down towards the driver's side." When the defendant pointed to a pocket in the door, Officer Burford was able to see the handle of the knife sticking out of the pocket.

¶ 14   At this point, Officer Burford asked the defendant to exit her vehicle. Due to concerns about officer safety, he handcuffed her, adjusted the handcuffs for proper fit, and escorted her to his squad car. He testified that he did not ask the defendant any questions while he was doing so. However, he stated, the defendant continued to make statements to him. She told him, "I did it for self-defense." She also stated, "He swung at my eye."

¶ 15   According to Officer Burford, he realized that he was not wearing his wireless microphone while the defendant was making these statements. He testified that he walked her to his squad car, reached into the car, retrieved his microphone, and read the *Miranda* warnings to her. He then secured her in the squad car and removed the three passengers from the defendant's vehicle before transporting the defendant to the police station.

¶ 16   The court viewed a recording from the camera system in Officer Burford's squad car. The recording system includes a dashboard camera that records video of what is occurring in front of the vehicle, a wireless microphone that records audio outside the vehicle, and a recording system that records both audio and video inside the vehicle.

6

¶ 17   It is the audio portion of the recording that is at issue here. Approximately five minutes into the recording, a female voice can be heard talking in the background, although her words are not clear. Then, Officer Burford can be heard reciting the *Miranda* warnings as follows: "You got a right to remain silent. Anything you say can be used against you in a court of law, alright? If you want to have an attorney present while we're talking, you're more than welcome to have one present. Okay, um, so, you can continue." He did not ask the defendant whether she understood these rights.

¶ 18   In response, the defendant told Officer Burford, "I was gonna say the same thing to anybody." Officer Burford then stated, "You don't have to talk to us if you don't want to. Keep saying what you were saying. Go ahead." The defendant replied, "That's it. And then we left." Officer Burford continued, "You said you had the knife." In response to this, the defendant said, "She swung at me." She then noted that a "big guy" struck her in the eye, and she reiterated that she "did it in self-defense." Officer Burford asked, "What'd you do?" The defendant replied, "I stabbed her."

¶ 19   At this point, the defendant can be seen entering the vehicle and sitting down in the back seat. The recording system in Officer Burford's squad car captured three phone conversations the defendant had while waiting for him to return to the car. As noted earlier, the defendant admitted during these phone calls that she stabbed someone.

¶ 20   Granite City Police Detective Gary Brooks testified at the hearing concerning his interview with the defendant at the police station. Another detective, Detective Fischer, was also involved. Detective Brooks testified that he began the interview by asking the defendant basic questions, such as her name and age and whether she could read and

7

write. The defendant told him she was 18 years old and was a high school senior. She also indicated that she could read and write. Detective Brooks read the defendant the warnings mandated by *Miranda*. He testified that she indicated that she understood her rights, and she did not appear to have any difficulty understanding what was happening at any point during the interview. He further testified that the defendant never asked for an attorney or indicated that she did not want to speak with the detectives. Detective Brooks testified that he and Detective Fischer spent 20 minutes questioning the defendant. They then left the room for approximately 20 minutes. When they returned, they took buccal swabs and spent an additional eight minutes questioning her.

¶ 21 On cross-examination, defense counsel asked Detective Brooks why he did not stop questioning the defendant "in an abundance of caution" when he learned that she was still in high school. In response, Detective Brooks explained that at 18 years old, the defendant was an adult, and she gave no indication that she was not able to decide for herself whether to talk to the detectives.

¶ 22 The court also viewed the video-recording of the interview. The recording begins with the two detectives introducing themselves to the defendant. Detective Brooks then told the defendant that the interview would be recorded, and asked her general questions, such as her name, age, contact information, and whether she was still in high school. He then provided her with a form setting forth her *Miranda* rights.

¶ 23 Detective Brooks asked the defendant to read the first paragraph of the *Miranda* warnings out loud. After she read it, he asked if she understood what she just read. The defendant indicated that she did. Detective Brooks then began reading the remainder of

8

the *Miranda* warnings. When he explained that she had the right to have an attorney present during questioning, the defendant asked, "What if I don't have a lawyer yet?" Detective Brooks replied, "I'm just about to get to that." He then explained that an attorney could be provided for her.

¶ 24 When Detective Brooks finished reading the warnings, the defendant indicated that she understood her rights. Detective Brooks asked, "Do you have any questions about any of these?" The defendant replied, "I don't know if I should wait for a lawyer." He responded, "That's up to you. We just want to get your side of the story." He went on to say, "It's totally up to you, alright?" The defendant said, "It's fine." She then initialed and signed the waiver form. While she was doing this, Detective Brooks asked, "And just so we're clear, you're okay with talking to us without an attorney?" The defendant indicated that she was.

¶ 25 The court announced most of its ruling from the bench. The court first addressed the defendant's motion to quash her arrest. The court found that all that was needed to justify the initial stop of the defendant's vehicle was a reasonable, articulable suspicion. The court noted that the defendant's vehicle matched the description of the suspect vehicle, and she was stopped within a few blocks of the crime scene. The court found that these circumstances gave rise to a reasonable, articulable suspicion sufficient to justify the stop. The court then found that the purpose of Lt. Bridick's question to the defendant was not to elicit incriminating statements, but rather, to determine whether he could shorten the stop if she were not coming from the Quick Trip. The court thus found that

9

both the initial stop and the question were proper, and therefore denied the defendant's motion to quash.

¶ 26   The court went on to consider the defendant's motion to suppress her statements. The court first noted that although the motion mentioned the defendant having a learning disability and difficulty with reading comprehension, the defendant did not present any evidence to the court to support these allegations. The court also noted that there were three different statements at issue, and went on to consider them separately.

¶ 27   The court reiterated its earlier finding that Lt. Bridick's question to the defendant was proper. The court concluded that the defendant's response to his question was therefore admissible.

¶ 28   The court next considered the circumstances of the defendant's interview with Detectives Brooks and Fischer. The court noted that the interview took place only two hours after the defendant's arrest and lasted for a short time. The court further noted that the defendant initialed each of her *Miranda* rights on the waiver form, and that she appeared to understand them. Finally, the court noted that, assuming the defendant has a learning disability, as alleged in her motion, "that in and of itself doesn't indicate that she couldn't give consent. It is just a factor that this court must consider." The court found the defendant's waiver of her *Miranda* rights was knowing and voluntary, and therefore ruled that her statements to the detectives were admissible.

¶ 29   The court took the matter of the defendant's statements to Officer Burford under advisement. The trial judge indicated that she would listen to the recording again before making her decision. Subsequently, the court entered a written order finding that Officer

Burford's testimony was credible and that the defendant's statements to him were made spontaneously. The court ruled that because the defendant's statements were not in response to police questioning, they were admissible. The court did not explicitly address the defendant's statements to Officer Burford after he recited the *Miranda* warnings or the defendant's phone calls. However, a recording containing these statements was admitted at trial.

¶ 30   The matter proceeded to trial. Lt. Bridick, Officer Burford, and Detective Brooks all gave testimony that was essentially identical to their testimony at the motion hearing. Officer Burford and Detective Brooks were asked to address some additional matters, however. Officer Burford testified that he did not observe any bruises or injuries on the defendant, but he acknowledged that he was not looking for injuries. On cross-examination, he admitted that he was required to wear his wireless microphone while he was outside the vehicle. He acknowledged that he did not check to be sure he had it on when he got out of the car. He testified that he did not tell the defendant that Kaitlin Juenger died of her injuries. The recording from his squad car's recording system was played for the jury.

¶ 31   Detective Brooks testified that he began his interview with the defendant at the police station at 3:45 in the morning. He noted that this was approximately 45 minutes after she was brought into the station. He further testified that the defendant spent a total of 52 minutes in the interview room, including a 20-minute period during which he and Detective Fischer left the room. Detective Brooks testified that the defendant did not have any injuries that required medical attention, but he noted that she "had a very superficial

11

wound" over her right eye. Asked if the defendant knew that Juenger had died, he replied, "Not to my knowledge." He testified that the defendant did not tell him at any point that she was afraid she would be killed or suffer great bodily injury. He noted, however, that she did use the phrase "self-defense."

¶ 32    On cross-examination, Detective Brooks acknowledged that he did not ask the defendant if she wanted medical treatment for the injury to her face. He testified that when he conducted the interview, he was aware that Juenger had died of her injuries.

¶ 33    The video recording of the interview was played for the jury. After waiving her *Miranda* rights, the defendant told the detectives that she went to the Quick Trip with three people—her friend, Antonio; her cousin, Chatto; and a girl named Holly. She explained that even though Chatto was her cousin, she did not know how to pronounce his real name. We note that Chatto is Arnulfo Hernandez.

¶ 34    The defendant told the detectives that all three of her passengers went into the convenience store, but she waited outside because she was on the phone. She stated that Carlin and Christian came out of the store without Hernandez. While the defendant, Carlin, and Christian waited for Hernandez, the other vehicle involved in the altercation pulled up to the gas pumps. The defendant did not know the three people in the vehicle, but she thought she recognized one of the men as someone she knew by the nickname "Big Thing." We note that the man was Hugo Valenzuela.

¶ 35    The defendant continued her story, noting that one of the men got out of the vehicle and "was talking cool with Antonio." He asked Carlin if the store still sold beer, and Carlin replied, "I think so." The man then went into the store. The defendant stated,

12

"And then when he came out, that's when he was talking shit." When asked what he was saying, the defendant said that he was "throwing up gang signs and talking about that." She also stated that "they were saying CV155." When asked whether she and her passengers were affiliated with any gangs, the defendant said she was not in a gang and she did not know whether Carlin or Hernandez were in a gang.

¶ 36   According to the defendant, she told Valenzuela to get away from her car, and he responded by asking why the defendant and her passengers were leaving and calling them "pussies." At this point, the defendant saw the woman (Kaitlin Juenger) get out of the vehicle. She noted that at some point, the other man (Luis Ortiz) also got out of the vehicle, but she did not know where he went or what he did.

¶ 37   At some point, the defendant got into her car and started to back out of her parking space. She explained that she did this so her passengers would "get the hint to just like go." According to the defendant, once her passengers were in her car, the woman (Juenger) and the "big guy" (Valenzuela) approached the driver's side of her vehicle and "started swinging in my side." The defendant then said, "And then I stabbed her." She went on to state, "I did it in self-defense." She told the detectives that she felt the knife strike Juenger, but she did not see the knife strike her, and she did not see any blood on the blade.

¶ 38   The detectives then began asking questions. In response to questioning, the defendant indicated that she kept the knife in the side pocket of her vehicle because she worked midnight shifts. She did not know whether Valenzuela, Juenger, or Ortiz had any knives or guns. When asked if any of her passengers had a knife or gun, the defendant

13

said that she knew none of them had a gun. However, she replied further, "A knife, I don't know." The defendant was asked if she was hit during the scuffle. She replied, "Yeah, I got hit in the eye." When asked what she did after the altercation was over, she replied, "I didn't know what to do so I just drove away."

¶ 39    The defendant was asked again about gang affiliations. She again stated that she was not affiliated with any gang. She noted, however, that she "talks to" people who are in the Surenos, including her cousins. She was then asked to clarify some things about the altercation. In response to these questions, the defendant noted that before she got into her vehicle, she was standing outside the driver's side of her car arguing with Juenger. While this was happening, Valenzuela was standing on the passenger side arguing with other members of the defendant's group. The defendant reiterated that she did not know whether anyone in the other group had any weapons, but she stated that someone threw a bottle at her car. Asked if she saw anything in Juenger's hand, the defendant said that Juenger was holding a bottle, but she did not swing the bottle at the defendant.

¶ 40    The defendant was asked about the activities of her three passengers during this altercation. She was specifically asked if any of her passengers attempted to throw punches through the windows or lean in front of her. The defendant did not know whether any of her passengers tried to throw punches through the windows. She told the detectives she did not think anyone tried to lean in front of her.

¶ 41    At this point, the detectives left the interview room. When they returned, Detective Fischer asked if there was anything the defendant had not told them that she thought was important. In response, she stated that while she was standing outside the vehicle, she

14

reached into the car, got out her knife, and told Juenger and Valenzuela to "get out of here." She told the detectives that she was not planning to use the knife. She stated that she did not wave the knife, but she was sure they saw it.

¶ 42 The jury also saw a video-recorded evidence deposition from Dr. Raj Nanduri, the forensic pathologist who performed an autopsy on Kaitlin Juenger. Dr. Nanduri testified that the cause of Juenger's death was a single stab wound to the front of her chest which led to "massive" internal bleeding. Dr. Nanduri explained that the stab wound went through Juenger's heart. She testified that the total depth of the wound was four inches. Asked whether she found evidence of a struggle, Dr. Nanduri replied, "There were some abrasions and contusions to the hands; that might suggest a struggle."

¶ 43 Antonio Carlin and Hugo Valenzuela each testified for the State. Carlin testified that at the time the events at issue occurred, he was affiliated with a gang known as the Surenos. He explained that the Surenos and CV155 were rival Latin gangs. Earlier that night, his friend, Arnulfo Hernandez, got into a fight while Carlin and Hernandez were "roaming around" the trailer park where Hernandez lived. The only injuries he sustained were bruises to his face. After the fight, however, an intoxicated Hernandez fell and "busted" his lip. They decided he needed to go to the hospital. Carlin explained that because both he and Hernandez were intoxicated and neither had a car, he sent a text message to the defendant to ask her for a ride to the nearest hospital.

¶ 44 Carlin testified that on the way to the hospital, Hernandez asked the defendant to stop at the Quick Trip so he could buy alcohol. He stated that the defendant parked near the front door, and he and Hernandez went into the store. Carlin purchased a 12-pack of

15

beer and walked out. He testified that Hernandez was still in the store waiting to pay for the tequila he was buying.

¶ 45 Carlin next testified that while he waited for Hernandez to exit the store, a white sport utility vehicle pulled up to the gas pumps. Two men got out. One man began pumping gas, while the other approached Carlin and asked him if the store was still selling alcohol. When Carlin said, "Yes," the man went into the store. When he came out, he asked, "Are you guys Surenos?" to which Carlin replied, "Yeah, we are Surenos." It was at this point that the man told Carlin he was a member of CV155. We note that this man was Hugo Valenzuela, and the man pumping gas was Luis Ortiz.

¶ 46 According to Carlin, Valenzuela then "start[ed] approaching the car trying to come towards us and everything." Carlin and Valenzuela began yelling back and forth at each other. While they were yelling at each other, the defendant, Hernandez, and Holly Christian were in the defendant's car. He noticed a woman (Kaitlin Juenger) get out of the white vehicle at this time. Carlin testified that he did not see what happened between Juenger and the defendant while he was arguing with Valenzuela. He further testified that although Juenger threw a beer bottle at him at some point, he did not see her carrying any weapons. He noted that Ortiz stood by his vehicle and did not participate in the altercation.

¶ 47 Carlin testified that he was not carrying any weapons, but he knew that Christian was carrying a knife. He asked her to toss him her knife, which she did. He testified that he told Valenzuela to step away from him, but Valenzuela continued to advance. Carlin then stabbed Valenzuela in the stomach, and Valenzuela turned away. Carlin

16

acknowledged that he did not see Valenzuela wielding a knife or gun. He testified that the defendant started to move her car after he stabbed Valenzuela. He ran to the car and got in. The defendant then drove away.

¶ 48   On cross-examination, Carlin testified that he was not sure whether he stabbed Valenzuela while standing outside the defendant's vehicle or through the window while seated in the vehicle. He admitted that he lied to police, telling them that both Juenger and Valenzuela were armed with knives. He also admitted that his testimony was part of a plea deal. Finally, he testified that he did not at any point lean across in front of the defendant.

¶ 49   Valenzuela testified that he was a member of a gang called CV155 when the events at issue unfolded, but he stated that he left the gang after that time. He acknowledged that he was intoxicated when the events took place. He explained that he spent the evening drinking at a party in Granite City. He got a ride home from that party with his friend, Luis Ortiz, and Ortiz's girlfriend, Kaitlin Juenger. When Ortiz stopped at the Quick Trip to buy gas, Valenzuela and Juenger went into the store to buy cigarettes. Valenzuela testified that an argument ensued between him and a group of people he encountered, but his memory concerning how that argument began was somewhat hazy. He did not remember whether he first encountered the group inside the store or in the parking lot, and although he recalled that the argument had to do with gangs, he could not remember what was said.

¶ 50   Valenzuela testified that while he and Juenger were inside the store, he saw a man from the other group wearing a Rams Jersey with the number 13 on it. He explained that

17

the number 13 is used to represent the Surenos gang, so he asked the man if he was a member of the Surenos, and the man said yes. We note that the man in the Rams jersey was Arnulfo Hernandez.

¶ 51    Valenzuela testified that he, Juenger, and the man in the Rams jersey (Hernandez) all walked out of the store, and the argument continued in the parking lot. According to Valenzuela, all four members of the other group—two males and two females—were arguing and yelling. He testified that Ortiz remained in his vehicle during this argument. He did not know where Juenger was. Although the argument was verbal, Valenzuela expected a fistfight to break out.

¶ 52    Valenzuela testified that at some point, he began walking back towards Ortiz's vehicle, which remained parked by the gas pumps. He recalled that Ortiz yelled to Juenger, telling her to get back in his vehicle so they could leave. He testified, however, that Juenger continued to argue with the other group "when they were pulling out" in their vehicle. Valenzuela started to walk towards Juenger to try to get her to come back to the vehicle, but before he reached her, Juenger ran back to Ortiz's vehicle on her own. She then collapsed. Valenzuela could not recall whether he saw Juenger bleeding; he only remembered that she would not wake up. He further testified that he realized he had been stabbed during the altercation only later, after the police arrived. He explained that he felt "something dripping down," and when he lifted up his shirt, he saw that it was blood.

¶ 53    The defendant testified on her own behalf. Much of her trial testimony was consistent with the account she gave to Detectives Brooks and Fischer at the police station. There were, however, some notable differences. For example, the defendant

testified that she carried a knife with her that night because she needed it to cut a friend's birthday cake, not for self-defense. She also testified that when Juenger first approached her vehicle, she asked the defendant her name and then began laughing when the defendant said her name was Breanna.

¶ 54 The most significant discrepancies involved what happened after the verbal altercation escalated into a physical fight. The defendant testified that as she attempted to drive away, Juenger and Valenzuela leaned into her car window. She testified that Carlin tried to help her fight them. To do so, he leaned over from the passenger seat, putting his torso between the defendant and the steering wheel. The defendant testified that she picked up her knife and swung it once or twice. She explained that she did this because Valenzuela struck her in the eye, and she was afraid of him. She testified that she then put the knife away and attempted to separate Carlin and Valenzuela, who were still fighting. Once they were separated, the defendant drove away.

¶ 55 The defendant testified that when she swung the knife, she did not feel it strike anyone. She acknowledged that she told police that she did feel it strike someone. She explained that at the time, she assumed the knife must have struck Juenger based on what the police told her.

¶ 56 The defendant was cross-examined extensively concerning these discrepancies. Asked to clarify whether she was now saying that she did not stab Juenger, the defendant replied, "Possible, yeah." The prosecutor asked her to elaborate. The defendant responded, stating, "I did not tell you guys about the part about Antonio." She explained that she did not tell police about Carlin's role in fighting with Valenzuela through the car

19

window on her side because she did not want to get him in trouble. She further explained, "I was hoping Antonio would bring it up and then [the police] would come ask me about it, but that didn't happen."

¶ 57    Additional witnesses testified concerning their observations of portions of the altercation. We will discuss relevant portions of their testimony as needed.

¶ 58    The jury received instructions on self-defense and second-degree murder. Jurors were instructed that they could find the defendant guilty of second-degree murder, rather than first-degree murder, if they found that at the time of the murder, the defendant believed the circumstances to be such that her use of force was justified, but that her belief was unreasonable. The jury found the defendant guilty of first-degree murder. The defendant filed a posttrial motion. The court denied that motion after a hearing. The court subsequently sentenced the defendant to 22 years in prison. This appeal followed.

¶ 59                                    II. ANALYSIS

¶ 60                               A. Motion to Suppress

¶ 61    The defendant first argues that the court erred in denying her motion to suppress her statements to police. We disagree.

¶ 62    A motion to suppress evidence presents mixed questions of law and fact. *People v. Croom*, 379 Ill. App. 3d 341, 348 (2008). On appeal, we review the trial court's findings of fact under the deferential manifest-weight-of-the-evidence standard. *Id*. at 348-49. However, we review *de novo* the court's ultimate conclusion as to whether the evidence should have been suppressed. *Id*. at 349.

¶ 63   As we discussed earlier, the defendant made multiple incriminating statements to police, and the circumstances surrounding each statement were different. We will therefore address each statement separately.

¶ 64   We will first consider the defendant's statement to Lt. Bridick, and we will then consider the statements she made to Officer Burford before he read her the *Miranda* warnings. She argues that her statements to both officers should have been suppressed because she was in custody for purposes of *Miranda* when she made them, but she did not receive the warnings required by *Miranda.* We disagree.

¶ 65   In *Miranda v. Arizona*, the United States Supreme Court held that a criminal defendant's statements are inadmissible if they are made during a custodial interrogation unless the defendant is informed of certain rights. *Id*. (citing *Miranda*, 384 U.S. at 444). The admissibility of the defendant's statement to Lt. Bridick turns on whether she was "in custody" for purposes of *Miranda* when she made it. The admissibility of her statements to Officer Burford turns on whether she made the statements in response to "interrogation."

¶ 66   Whether an individual is "in custody" for purposes of *Miranda* is a two-part inquiry. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). First, the court must determine what the circumstances of the interrogation were. Second, the court must consider whether, under those circumstances, a reasonable person, innocent of any crime, would have believed she was free to leave or refuse to answer the officer's questions. *Id*. at 506. Relevant factors include the time and place of the interrogation, the number of officers present, whether friends or family members were present, any indicia of formal arrest,

21

and how the defendant arrived at the place of questioning. *Croom*, 379 Ill. App. 3d at 349. Although the officer's intent may be relevant to determining whether he "created a coercive atmosphere," the focus of our inquiry is on what a reasonable person in the defendant's position would have believed, not the officer's subjective intent. *Id*.

¶ 67    When Lt. Bridick asked the defendant where she was coming from, he was the only officer present. The defendant was not in a police station; instead, she was seated behind the wheel of her own vehicle, surrounded by her cousin and two friends. These circumstances weigh against a finding of custody.

¶ 68    The defendant, however, points to two circumstances in support of her claim that she was "in custody" for purposes of *Miranda*. First, she points out that Lt. Bridick acknowledged that the only reason he stopped her vehicle was to determine whether her Mini Cooper was the vehicle involved in the stabbing incident. As we have already mentioned, however, the key question in our inquiry is not the officer's subjective intent, but what a reasonable person in the defendant's position would believe. *Id*. Nothing in Lt. Bridick's sole question to the defendant would lead a reasonable person, innocent of any crime, to believe that she was the focus of a criminal investigation.

¶ 69    Second, the defendant points to the fact that she was stopped by a marked police squad car with its lights activated. She argues that "[w]henever a marked police cruiser has its emergency lights activated, a reasonable person would not feel free to leave the scene." This argument is not supported by law.

¶ 70    A police officer may briefly stop an individual for questioning if he has a reasonable, articulable suspicion that the individual was involved in possible criminal

22

activity. *People v. Chestnut*, 398 Ill. App. 3d 1043, 1050 (2010) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). A brief investigatory "*Terry*" stop "does not indicate an individual is in custody." *Id.* at 1053. However, police may not exceed the permissible scope of a *Terry* stop by conducting a search or engaging in questioning that goes beyond what is necessary to determine whether the individual is in fact engaged in any criminal activity. See *id.* at 1050, 1054. *Miranda* warnings are required when a suspect "has suffered a restraint of freedom of movement *to the degree associated with formal arrest*." (Emphasis added.) *Id.* at 1054 (citing *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994)). They are not required during a brief investigatory stop unless the officer exceeds the permissible scope of such a stop under *Terry* and its progeny. *Id.*

¶ 71    Here, Lt. Bridick's lone question to the defendant fell within the permissible scope of a *Terry* stop. As such, she was not "in custody" for purposes of *Miranda* until she was removed from her vehicle and placed in handcuffs. We find no error in the court's decision to admit the defendant's response to Lt. Bridick's question.

¶ 72    We turn our attention to the statements the defendant made to Officer Burford before he gave her the *Miranda* warnings. We agree with the defendant that she was in custody for purposes of *Miranda* when she made these statements. She had been removed from her vehicle and was being placed in handcuffs when she made the statements. However, the court found that the defendant made these statements spontaneously, not in response to questions from Officer Burford. We give great deference to this factual finding. See *Braggs*, 209 Ill. 2d at 505. The exclusionary rule of *Miranda* applies only to custodial interrogation; it does not require the suppression of spontaneous statements

23

volunteered by a suspect. *People v. Acoff*, 188 Ill. App. 3d 208, 212-13 (1989). An officer is not required to interrupt a suspect making a spontaneous incriminating statement to explain the *Miranda* rights. *People v. Lang*, 106 Ill. App. 3d 808, 816 (1982). Thus, we find that the court properly admitted Officer Burford's testimony about the statements the defendant made to him before he recited the *Miranda* warnings.

¶ 73    The defendant's remaining arguments concerning the admissibility of her statements focus on the statements she made to Detectives Brooks and Fischer at the police station. However, at least some of her arguments also appear to apply to the statements she made to Officer Burford after he gave her the *Miranda* warnings. We will consider the admissibility of each of these statements separately.

¶ 74    It is the State's burden to prove by a preponderance of the evidence that a defendant's inculpatory statements were voluntary. To meet this burden, the State must prove that the defendant made a knowing and intelligent decision to waive her *Miranda* rights. *Braggs*, 209 Ill. 2d at 505. It is not necessary to show that the defendant understood "every possible consequence" of waiving her rights. *Id*. at 515. It is also not necessary to show that the defendant was aware of every piece of information that might have influenced her decision to confess. *People v. Bernasco*, 138 Ill. 2d 349, 359 (1990). It is only necessary to show that the defendant understood two things: (1) that her statements could be used as evidence to secure a conviction, and (2) that she had the right to request an attorney and/or refuse to answer questions. *Id*. at 360.

¶ 75    Whether a defendant's inculpatory statements were voluntary depends on the totality of the circumstances. *People v. Bowman*, 335 Ill. App. 3d 1142, 1152 (2002).

24

Relevant circumstances include the background, experience, and conduct of the defendant. *Braggs*, 209 Ill. 2d at 515. Also relevant is any evidence that a defendant's intellectual capacity is limited or impaired. *Id*. at 514. Another relevant circumstance is any evidence of police overreach. *Bowman*, 335 Ill. App. 3d at 1152. Police may not elicit a confession through deliberate fraud or trickery. *Id*. at 1153. A confession will be found to be involuntary if "the defendant's will was overborne at the time of the confession so that the confession cannot be deemed the product of a rational intellect and free will." *Id*.

¶ 76    We will first address the statements the defendant made to Detectives Brooks and Fischer at the police station. She argues that these statements were not voluntary for two reasons. First, she argues that she was unable to understand the rights she was waiving because she was a high school student with a learning disability that impacted her ability to read and comprehend language. She also points to evidence that she earned poor grades in her high school English classes, and that she had no prior experience with the police. We are not persuaded.

¶ 77    We note that although the defendant did not present any evidence concerning her learning disability or difficulty in English classes at the hearing on her motion to suppress, the presentence investigation report does include some school records which indicate that she earned Cs in several of her English classes, including a class in oral comprehension, while earning mainly As and Bs in other classes. We also note that the circumstances emphasized by the defendant are relevant in determining whether a defendant was able to make a knowing and intelligent waiver of her rights. See *Braggs*,

209 Ill. 2d at 514 (explaining that any evidence of a defendant's mental or intellectual impairment is a relevant factor); *People v. Prude*, 66 Ill. 2d 470, 476 (1977) (finding that two defendants' prior encounters with police supported the conclusion that their waiver of their *Miranda* rights was knowing and intelligent). However, we reject her argument after consideration of *all* the relevant circumstances.

¶ 78 One relevant factor in determining whether a defendant has made a knowing and intelligent waiver of her rights is the defendant's conduct during the interrogation. See *Braggs*, 209 Ill. 2d at 515. Here, both the trial court and this court had the opportunity to view the video recording of the defendant's interview at the police station. While Detective Brooks was reading the defendant her *Miranda* rights, she asked him a question about what would happen if she did not have her own attorney. She also indicated that she was considering whether to wait until she had an attorney before answering questions. The fact that she was able to intelligently discuss the implications of her rights before waiving them indicates that she did, in fact, understand them. Moreover, there was no indication that she had difficulty understanding the detectives' questions at any point during the interview. Considering the totality of the circumstances we have just discussed, we find no error in the trial court's conclusion that the defendant made a knowing and intelligent waiver of her rights at the police station.

¶ 79 The defendant further argues that her decision to waive her *Miranda* rights was not voluntary because the detectives withheld crucial information from her by failing to inform her that Kaitlin Juenger died of her injuries. She contends that she needed this information to make a knowing and intelligent waiver of her *Miranda* rights because "an

26

aggravated battery charge is far less serious than a charge of first-degree murder." We are not persuaded.

¶ 80 There is no requirement that police inform a suspect of all material facts within their knowledge, including the precise nature of the charge or the possible punishment the suspect might face. *Prude*, 66 Ill. 2d at 475-76. As we have already explained, a confession will not be found to be involuntary merely because the defendant is not aware of every piece of information that might have a bearing on her decision to confess. See *Bernasco*, 138 Ill. 2d at 359; see also *Prude*, 66 Ill. 2d at 475-76.

¶ 81 It is also worth noting that, although the defendant accuses the officers of deceiving her by withholding information from her about Juenger's condition, there is no evidence that they deliberately withheld information in an effort to trick her into offering a confession she otherwise would not have given. The type of police conduct we are concerned with " 'involves affirmative acts of fraud or deception.' " *Bowman*, 335 Ill. App. 3d at 1153 (quoting *People v. Smith*, 108 Ill. App. 2d 172, 179 (1969)). We therefore find that the court properly admitted the defendant's statement at the police station.

¶ 82 We will next consider the statements the defendant made to Officer Burford after he retrieved his wireless microphone and read her the *Miranda* warnings. As stated earlier, the defendant's arguments about her waiver of her rights focus on the statement she made in the police station. She does, however, mention that Officer Burford, like the detectives, did not tell her that Juenger died. We do not find that this prevented her from

27

making a knowing and intelligent waiver of her rights when she answered Officer Burford's postwarning questions for the reasons we have just discussed.

¶ 83   We note, however, that we are troubled by the manner in which Officer Burford rushed through reciting the *Miranda* warnings and then questioned the defendant without stopping to ask whether she understood her rights. He also did not stop to ask whether she, in fact, wanted to waive her rights before he began asking questions designed to get her to repeat her story. Failure to "obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

¶ 84   Although we believe it is clear from the defendant's conduct during her subsequent interview at the police station that she understood her rights when Detective Brooks explained them to her, it is less clear that she understood her rights when Officer Burford recited them to her earlier, during the traffic stop. This is particularly concerning when we consider the fact that the defendant was young, the fact that she had no prior experience with law enforcement, and the fact that she appears to have at least some level of difficulty with oral comprehension skills. A suspect "must be adequately *and effectively* apprised of his rights." (Emphasis added.) *Miranda*, 384 U.S. at 467. Officer Burford's hurried recital of those rights may not have effectively communicated them her if she was not already aware of them. Unlike her conduct at the police station, nothing in her conduct during the traffic stop indicated whether she understood her rights.

¶ 85   Nevertheless, we need not consider whether the statements the defendant made in response to Officer Burford's post-*Miranda* questions were properly admitted. For one

thing, the defendant does not specifically argue that anything about the manner in which Officer Burford advised her of her rights rendered her waiver involuntary. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (providing that arguments not raised in a party's brief are forfeited). For another, the statements were identical in substance to the statements she made before the officer retrieved his wireless microphone and recited the *Miranda* warnings. We have already found that those statements were properly admitted. In addition, because the defendant's spontaneous statements provided probable cause to arrest her and take her into custody, any impropriety in Officer Burford's postwarning questioning would not affect the admissibility of her later statements to the detectives at the police station. Thus, admission of these duplicative statements, if error, was harmless beyond a reasonable doubt. For these reasons, we find no reversible error in the court's decision to deny the defendant's motion to suppress her statements.

¶ 86                              B. Self-Defense

¶ 87    The defendant next argues that she "set forth sufficient facts that she legally acted in accordance with the affirmative defense of self-defense." Although she frames her argument in terms of setting forth sufficient facts, the essence of her argument appears to be that the evidence was such that a reasonable jury should have found that she satisfied all the elements of that defense. We reject this contention.

¶ 88    As the defendant correctly states, an individual is justified in the use of force "when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against [the] imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2012). There are six elements to a claim of self-defense: (1) force was

29

threatened against the defendant; (2) the defendant was not the initial aggressor; (3) the risk of harm was imminent; (4) the threatened force was not lawful; (5) the defendant subjectively believed that the use of force applied was necessary to avert the danger; and (6) that belief was objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. The use of deadly force is justified only if the defendant was threatened with force likely to cause death or great bodily harm. *People v. Anderson*, 234 Ill. App. 3d 899, 906 (1992).

¶ 89    To be entitled to a jury instruction on self-defense, a defendant must present at least some evidence of each of these six elements. *Washington*, 2012 IL 110283, ¶ 35. Once a defendant provides sufficient evidence to raise the issue of self-defense, the State must negate at least one of these elements by proof beyond a reasonable doubt. *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995). This is because a lack of legal justification is an element of first-degree murder. *Id.* at 127.

¶ 90    In this case, we agree that the defendant presented sufficient evidence to warrant instructions on self-defense. As we stated earlier, the trial court provided those instructions. The defendant argues that any "rational trier of fact would have agreed" that the elements of self-defense were present. The question, however, is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). Applying this standard, we find that there was sufficient evidence for the jury in this case to reject the defendant's claim of self-defense.

30

¶ 91 It is important to emphasize that determining the existence of the elements of self-defense required the jury to resolve conflicting testimony and assess the credibility of witnesses. *Id.* We give great deference to a jury's findings on questions of credibility. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007). There were reasons for a rational jury to find the defendant's testimony not to be credible. Her trial testimony differed from her statements to police in significant respects, and her claim that four people (Juenger, Valenzuela, Carlin, and the defendant) were simultaneously fighting through the window of her small vehicle could have been seen by the jury as inherently implausible. The jury was therefore not required to believe the defendant's testimony regarding any of the elements of self-defense.

¶ 92 It is also important to reiterate that the use of deadly force is only justified to defend against death or great bodily harm. See *Anderson*, 234 Ill. App. 3d at 906. Here, the defendant never explicitly stated that she was afraid that she would be killed or suffer great bodily harm, either in her statements to police or in her trial testimony. There was evidence from which a rational jury could infer that she feared Valenzuela would inflict great bodily harm. The defendant testified that Valenzuela, who was described by multiple witnesses as being a large man, was throwing punches at her head. This claim was supported by the testimony of one other witness. Amber Sanders was inside the Quick Trip convenience store purchasing a snack when the fight broke out. She testified that she saw both a woman and a large man standing next to the driver's side door of the Mini Cooper at some point during the altercation.

31

¶ 93 However, we do not believe the evidence, particularly when viewed in the light most favorable to the State, *required* a rational jury to draw that inference. It is worth noting that Sanders did not witness the entire fight, and it is not clear from her testimony whether she saw Valenzuela standing near the driver's side door at the relevant time. Other evidence contradicted the defendant's testimony. Valenzuela testified that Juenger was standing next to the defendant's car arguing with her while he and Ortiz waited near their own vehicle. He then testified that when he walked towards Juenger to try to urge her to return, she walked back towards the white vehicle and collapsed. His account is supported by the testimony of Megan Donet, who witnessed portions of the altercation from the doorway of a nearby Jack in the Box. Donet saw a woman standing next to the defendant's door. She testified that a large man ran towards the defendant's vehicle only after the woman moved away and collapsed. Resolving these conflicting accounts was up to the jury. See *Lee*, 213 Ill. 2d at 225.

¶ 94 Whether the jury believed that Valenzuela joined Juenger in throwing punches at the defendant is significant for two reasons. First, unlike Valenzuela, Juenger was comparable in size to the defendant, and the defendant acknowledged that Juenger did not swing at her with anything other than her fist. Second, while the defendant testified that she was afraid of Valenzuela, she never claimed to have been afraid of Juenger. Jurors were not required to find that the defendant subjectively believed she was in imminent danger of death or great bodily harm, much less that such a belief was reasonable.

¶ 95 Moreover, the use of force is not legally justified unless the defendant believed that the kind and amount of force used was necessary to avert the danger. *Anderson*, 234

32

Ill. App. 3d at 906. The evidence in this case suggested that the defendant had other options. There was no reason she could not have closed the window. She offered no explanation for why she could not have slashed at Valenzuela's arms with her knife instead of thrusting it in a stabbing motion with sufficient force to plunge it into Juenger's chest to a depth of four inches. Indeed, this would have been easier for her to accomplish. The defendant told police that she was right-handed and that she wielded the knife in her right hand—the hand farthest from Juenger and Valenzuela if they were standing outside her vehicle. Thus, rational jurors were not required to find that the defendant subjectively believed the amount of force she used was necessary to repel the attack, much less that such a belief was objectively reasonable. We conclude that the evidence was sufficient for a rational jury to find that the defendant's conduct was not justifiable as self-defense.

¶ 96                                    C. Second-Degree Murder

¶ 97    The defendant next argues that she presented sufficient evidence of a mitigating factor that a rational jury should have found her guilty of second-degree murder, rather than first-degree murder. We are not convinced.

¶ 98    A defendant is guilty of second-degree murder, rather than first-degree murder, if one of two mitigating factors is present. 720 ILCS 5/9-2(a) (West 2012). One mitigating factor is that, at the time of the murder, the defendant subjectively believed that circumstances existed under which the defendant's conduct would have been justified by an affirmative defense such as self-defense had those circumstances actually existed. *Id*. § 9-2(a)(2). This mitigating factor is often referred to as "imperfect self-defense."

*Jeffries*, 164 Ill. 2d at 113. A defendant can be convicted of second-degree murder, rather than first-degree murder, if "there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *Id*.

¶ 99　Usually, the affirmative defense of self-defense and the mitigating factor of imperfect self-defense are raised together, as they were in this case. *Id*. at 126. However, there is an important difference between the two theories. As we have just discussed, the State must negate a claim of self-defense beyond a reasonable doubt in addition to proving the other elements of first degree by the same standard. *Id*. Once the State has met its burden, it is the defendant's burden to prove the existence of a mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2012).

¶ 100　The defendant argues that the evidence she presented was sufficient to meet this standard of proof. She further contends that "a rational trier of fact *would* have determined that this mitigating factor was present." (Emphasis added.) We disagree. While we agree with the defendant that a rational jury *could* have found the mitigating factor of imperfect self-defense to be applicable, we do not agree with her implicit contention that a rational jury could not have reached the opposite conclusion. The jury in this case was properly instructed on the theory of imperfect self-defense. We have already concluded that there was sufficient evidence to allow rational jurors to find that the defendant did not subjectively believe either that she was in imminent danger of death or great bodily harm or that the amount of force she used was necessary to deter the threat. We therefore reject her claim that a rational jury necessarily would have found her guilty of only second-degree murder.

¶ 101                    D. Ineffective Assistance of Counsel

¶ 102 The defendant's final contention is that she received ineffective assistance of counsel. She asserts that her trial counsel "at multiple points showed substantial opportunity for improved trial strategy but failed to do so." She raises two specific claims of ineffective assistance of counsel. First, she argues that counsel should have raised a *Batson* challenge to the composition of the jury venire. Second, she argues that a reasonably effective attorney would have requested jury instructions on two theories of second-degree murder—imperfect self-defense and serious provocation arising from mutual combat. She argues that counsel was ineffective for failing to request an instruction on serious provocation in addition to the imperfect self-defense instruction he did request. We reject both claims.

¶ 103 We evaluate claims of ineffective assistance of counsel under the two-part test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that the defendant suffered prejudice as a result. *Id*. at 687. To satisfy the first part of this test, the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 687-88. This requires the defendant to overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Id*. at 689. To satisfy the second part of the test, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

35

*Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

¶ 104 We will first consider the defendant's claim that counsel was inefficient for failing to challenge the composition of her jury venire based on *Batson*. She points to the results of the 2010 census, which indicates that the population of Madison County is approximately 3% Hispanic. The defendant asserts that, as such, "the venire should have consisted of a minimum [of] one or two Hispanic jurors." We are not persuaded.

¶ 105 The United States Supreme Court has long recognized that it violates a defendant's right to equal protection of the law when members of a defendant's race are "purposefully excluded" from the defendant's jury. *Batson*, 476 U.S. at 85 (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). In *Batson*, the Court considered how a defendant could meet the "burden of proving purposeful discrimination on the part of the State." *Id*. at 90.

¶ 106 In answering this question, the Court first explained that a defendant can make a *prima facie* showing of purposeful discrimination by demonstrating "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id*. at 93-94. If a defendant makes this showing, the burden then shifts to the State to prove that the venire was selected using " 'permissible racially neutral selection criteria and procedures.' " *Id*. at 94 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

¶ 107 The Court then explained that to make a *prima facie* showing of purposeful discrimination, a defendant must first "show that he is a member of a racial group capable of being singled out for differential treatment." *Id*. There are two types of additional

36

evidence the defendant may present in combination with this evidence. One option is to present evidence that members of the defendant's race have been absent from jury venires over a long period of time. *Id*. Another option is to present evidence that members of the defendant's race were "substantially underrepresented" on the defendant's venire along with evidence that the venire was selected using a method that created an " 'opportunity for discrimination.' " *Id*. at 95 (quoting *Whitus v. Georgia*, 385 U.S. 545, 552 (1967)). However, in evaluating claims of purposeful discrimination, courts must make a " 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Id*. at 93 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)).

¶ 108 Here, the defendant has not alleged, much less provided evidence, that Hispanics have been absent from Madison County juries over a long period of time. Similarly, while she does allege that Hispanics were underrepresented on the venire from which her jury was selected, she provides no evidence to support this conclusory allegation, and she does not allege that the venire was selected using a method that created an opportunity for racial discrimination. In short, the defendant has not provided this court with any basis to conclude that, had counsel challenged the venire based on *Batson*, his challenge would have been successful. Counsel cannot be found to be ineffective for failing to take an action that would have been futile. See *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 41; *People v. DeLuna*, 334 Ill. App. 3d 1, 16-17 (2002).

¶ 109 We next consider the defendant's claim that counsel was ineffective for failing to request an instruction on serious provocation resulting from mutual combat. We reject

this claim because we do not believe a serious provocation instruction would have been warranted under the evidence presented.

¶ 110 As we explained earlier, there are two statutory factors in mitigation that can reduce a charge of first-degree murder to second-degree murder. The first is what is known as imperfect self-defense, which we have already discussed. The second is that the defendant acted under a sudden and intense passion resulting from serious provocation by the individual killed. 720 ILCS 5/9-2(a)(1) (West 2012). One type of conduct that can constitute serious provocation is mutual combat. *People v. McCarthy*, 132 Ill. 2d 331, 340-41 (1989). A fight constitutes mutual combat if both participants entered into it willingly and fought on equal terms. *People v. Moore*, 343 Ill. App. 3d 331, 339 (2003). Mutual combat qualifies as serious provocation even if the defendant was the initial aggressor and even if the combat consists of "only a momentary scuffle." *People v. Lewis*, 229 Ill. App. 3d 874, 880-81 (1992).

¶ 111 Significantly, to qualify as mutual combat, a fight must in fact be mutual. *Id*. at 881. This places two limits on the applicability of a serious provocation instruction, both of which are relevant here. A serious provocation instruction is not appropriate if the defendant escalated the situation or used force that was excessive under the circumstances. *Moore*, 343 Ill. App. 3d at 339-40. It is also not appropriate if the defendant fought "with an attacker in an effort to ward off or defend one's self against an assault." *Lewis*, 229 Ill. App. 3d at 881. Here, there was no evidence that Valenzuela or Juenger ever brandished a knife or gun. Therefore, the defendant's use of a knife escalated the level of violence and constituted excessive force under the circumstances.

Also, the defendant asserted that she acted because she believed it was necessary to protect herself. This, too, is inconsistent with a theory of serious provocation due to mutual combat. Because the defendant would not have been entitled to an instruction on serious provocation due to mutual combat, we cannot find that counsel was ineffective for failing to request such an instruction. See *Wallace*, 2015 IL App (3d) 130489, ¶ 41; *DeLuna*, 334 Ill. App. 3d at 16-17.

¶ 112                          III. CONCLUSION

¶ 113  For the foregoing reasons, we affirm the defendant's conviction.


¶ 114  Affirmed.