THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. GREGORY BOWMAN, Defendant-Appellee.

Fifth District    No. 5—01—0340

Opinion filed December 27, 2002.—Rehearing denied February 13, 2003.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Al W. Johnson, of Johnson, Fellows, Blake & Terry, and Stephen B. Evans and Deeba Sauter Herd, all of St. Louis, Missouri, for appellee.

PRESIDING JUSTICE HOPKINS delivered the opinion of the court:

Gregory Bowman (defendant) was convicted in 1979 for the murders of two young women. Twenty years later, a newspaper article alleged a previously unknown collaboration between the detective to whom defendant confessed and a cellblock mate of defendant's during the time of his confession. Defendant filed a postconviction petition asserting that the new information rendered his confession coerced and his constitutional rights violated. After a hearing on defendant's postconviction petition, the trial court granted defendant a new trial. During the proceedings, the trial court imposed sanctions against the St. Clair County State's Attorney's office, to reimburse defendant for his expenses in responding to motions filed by the State.

The State appeals the trial court's order granting defendant a new trial and the trial court's order imposing sanctions. The State asserts, *inter alia*, that the trial court erred in ordering a new trial, because the evidence indicated no police scheme to coerce defendant's confession, and that the trial court abused its discretion in imposing sanctions. We affirm.

## FACTS

### Background

On September 7, 1979, defendant was charged by indictment with the murders of Elizabeth West and Ruth Ann Jany. At a hearing on October 24, 1979, defendant waived his right to a trial by a jury, in exchange for the State's waiving its plea for a death sentence. At the hearing, defendant's counsel indicated that defendant was entering his plea as provided by *North Carolina v. Alford*, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970), and that defendant indicated a willingness to plead guilty but a nonwillingness to concede facts admitting his guilt. Defendant's counsel stated, "[Defendant], in effect, is pleading guilty[—]desires to plead guilty." Defendant agreed with his counsel's statement, and the trial court admonished defendant as

required by Supreme Court Rule 402 (58 Ill. 2d R. 402) for a criminal defendant who pleads guilty.

Thereafter, the State presented a factual basis for defendant's guilty plea, including the testimony of deputy sheriff Robert Miller, who described defendant's confessions to the abductions and murders of Elizabeth West and Ruth Ann Jany. The State presented evidence corroborating defendant's confession to the murder of Elizabeth West: Elizabeth disappeared at approximately 11:15 p.m. on April 22, 1978, after walking home from a play at Belleville Township High School West; when Elizabeth's body was discovered, it was lying facedown in a wooded creek and it was fully clothed, except for a missing bra strap; and Elizabeth had been sexually assaulted, struck twice on the head with a blunt object, and then strangled to death. The State also presented evidence that, on the night of Elizabeth's disappearance, Judy Barnum had refused defendant's invitation to attend a play at either Belleville Township High School West or the Muny Opera.

Likewise, the State presented evidence corroborating defendant's confession to the murder of Ruth Ann Jany: Ruth Ann was abducted on July 7, 1978, at approximately 11:30 p.m. from a First National Bank automated teller machine located in downtown Belleville; at the time of her disappearance Ruth Ann did not have her purse in her possession; after Ruth Ann disappeared, a number of successful and unsuccessful attempts were made to withdraw money from her checking account via her automated teller machine card and a total of $330 was successfully withdrawn; and when Ruth Ann's body was discovered in a rural area south of Belleville, approximately 20 feet from a farmer's road and 400 feet from the county line, it was not buried, was fully dressed, and had around the neck a halter top with a knot. The State further produced evidence that both defendant and Ruth Ann had accounts with, and automated teller machine cards for, the First National Bank of Belleville and that, at the time of Ruth Ann's disappearance, defendant was spending an unusual abundance of cash. Defendant's corroborated admissions regarding the murder of Ruth Ann and the location of her body were made prior to the discovery of her body.

The trial court concluded that defendant was entering his plea voluntarily, after having knowingly and understandingly waived his rights, and that a factual basis existed for the plea. Defendant was sentenced on November 30, 1979, to two concurrent terms of natural-life imprisonment.

On January 7, 1980, the trial court denied defendant's motion to withdraw his guilty plea. Defendant appealed his sentence only, and in an order entered pursuant to Supreme Court Rule 23 (73 Ill. 2d R.

23), on February 25, 1982, this court affirmed defendant's sentences. *People v. Bowman*, 103 Ill. App. 3d 1207 (1982) (unpublished Rule 23 order).

On June 3, 1999, almost 20 years later, defendant filed a petition under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1998)). Defendant alleged that his statements to deputy sheriff Robert Miller were involuntary because defendant had recently learned from an article published in the St. Louis Post-Dispatch that Deputy Miller and Danny Stark had contrived a scheme to acquire defendant's confession, thereby creating circumstances bespeaking fraud, trickery, deceit, and coercion and that, thus, they had violated defendant's constitutional rights.

On November 28, 2000, at the postconviction hearing held before the Honorable Richard Aguirre, the following evidence was adduced.

Defendant testified that while he was incarcerated in the county jail, after his sentencing in an unrelated case and while awaiting his return to Menard Correctional Center (Menard), in which he had previously spent four years, defendant met Danny Stark, a cellblock mate. Defendant stated that he revealed to Stark that defendant was terrified of returning to Menard and that Stark thereafter orchestrated a plan to bond out of jail, return to jail, and help defendant escape. Defendant testified that in order to circumvent the weekly transfers to Menard until Stark returned to free defendant, he threw himself from the top bunk of the cell and was taken to the hospital. Defendant testified that he thereafter accepted Stark's suggestion that defendant make a statement regarding the Elizabeth West and Ruth Ann Jany murders, about which defendant previously had been questioned after his arrest in the unrelated case. According to the escape scheme, defendant could remain in the county jail while the police investigated his statements, avoiding a transfer to Menard, until Stark was released and could return to free defendant. Defendant explained that his attorney had provided him with newspaper articles and police reports and that police officers had, while questioning defendant previously concerning the murders, also revealed police reports to defendant. Defendant testified that from this information, he and Stark created "a believable story." Defendant testified that he never believed that his statements would be used against him because he had an alibi during the murders and he understood that the investigators had corroborated the alibi.

Defendant testified that after he requested to speak with an investigator, deputy sheriff Robert Miller arrived to interview him. Defendant stated that during the interrogations, Deputy Miller suggested the answers to the questions he had asked defendant.

Defendant told Deputy Miller that he would provide a written statement on the following Sunday, the day after the day defendant expected to escape with Stark. Stark was released, but on Sunday, after Stark failed to appear at the jail on Saturday, defendant recanted his confession. Defendant stated that he had been unaware of the collusion between Deputy Miller and Stark until the St. Louis Post-Dispatch published an article stating that Deputy Miller had admitted tricking defendant into confessing by recruiting Stark to convince defendant that Stark would assist in defendant's escape and keep defendant from returning to Menard.

Carolyn Tuft, a St. Louis Post-Dispatch investigative reporter, testified that she had interviewed Deputy Miller in February 1999. Tuft stated that during the interview, Deputy Miller indicated that he had placed Stark, a "con artist," in a cell with defendant and had told Stark to convince defendant that if defendant discussed the murders, defendant would avoid a transfer to Menard and stay in the county jail long enough for Stark to be released from jail, to return, and to assist in defendant's escape.

Bill Smith, also a St. Louis Post-Dispatch reporter, accompanied Tuft during her interview with Deputy Miller. He testified that during the interview Deputy Miller had referred to his knowledge of defendant's fear of returning to Menard. Smith testified that during the interview with Deputy Miller, Deputy Miller had conveyed the idea that it was his plan to obtain information from defendant through the escape scheme.

Danny Stark testified that prior to the underlying incident, he had worked as an informant for Deputy Miller. Stark testified that Deputy Miller did not place him in defendant's cellblock with the intent of promoting the escape scheme to obtain defendant's confession. Stark stated that while he was in the cellblock with defendant, defendant indicated his involvement with the disappearances of Ruth Ann Jany and Elizabeth West. Stark stated that because it was the right thing to do, he notified Deputy Miller that defendant was implicating himself in the murders. He testified that Deputy Miller told Stark to keep his ears open.

Stark explained that he and defendant, not Deputy Miller, concocted the escape plan and that it was common for inmates to discuss escaping. Stark testified that he had not reviewed information from the newspapers and had not discussed with defendant how to obtain additional information about the murders. Stark admitted, however, that he utilized defendant's intense fear of returning to Menard to promote the escape plan and that he might have relayed defendant's fear to Deputy Miller.

On March 21, 1979, the same day that defendant gave his first taped statement to Deputy Miller, the State's Attorney agreed to a bond reduction for Stark, and he was released. Stark asserted that although his charge at the time of defendant's confession was ultimately reduced to misdemeanor theft, that was based on a theory of Stark's accountability for the theft and was not based on the assistance Stark gave Deputy Miller in defendant's case.

Deputy Miller testified that he did not place Stark in the cellblock with defendant and that he did not propose the escape plan. Deputy Miller also denied that he conveyed the idea to Tuft and Smith that he had contrived the escape scheme between Stark and defendant to obtain defendant's confession.

Deputy Miller testified that he had utilized Stark as an informant approximately four to six times prior to defendant's case. Deputy Miller testified that in return for Stark's previous assistance, Deputy Miller would thereafter "[c]atch him speeding, let him go, give him a warning ticket." Deputy Miller stated that on March 10, 1979, Stark approached him with defendant's admissions and that he encouraged Stark to continue talking with defendant. Deputy Miller admitted that he may have told Stark to convince defendant that if defendant discussed the murders, defendant could stay in the county jail.

Deputy Miller testified that before speaking with defendant, he reviewed the July 28, 1978, report or spoke with Investigator David Gravot regarding Investigator Gravot's interrogation of defendant concerning the abduction and murder of Elizabeth West, in which defendant invoked his fifth amendment right to counsel and referred all questions to his attorney. Deputy Miller thereafter reread defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) before speaking with him. Deputy Miller explained that he had given details to defendant during his interview, *i.e.*, that Elizabeth West's bra strap was missing, to persuade defendant to continue his statements.

Deputy Miller testified that he was unaware of defendant's intense fear of returning to Menard but was aware that as a means of acquiring information from defendant, Stark was telling defendant that he would assist in defendant's escape. Deputy Miller explained that he did not note the escape plan in his police reports because he did not believe that an escape would occur. Deputy Miller stated that during his and defendant's fourth and last conversation, on Sunday, March 25, 1979, after defendant was to escape on Saturday with the assistance of Stark, who had been released from jail on Wednesday, March 21, 1979, defendant recanted his confession.

Deputy Miller testified that in exchange for Stark's assistance in

defendant's case, Deputy Miller probably attempted to obtain leniency through the State's Attorney's office regarding Stark's pending theft charges.

On April 12, 2001, the trial court found that defendant had pleaded guilty in 1979 in accordance with *Alford*. In its order, the trial court also made the following pertinent factual findings:

(1) On March 10, 1979, while defendant remained in the county jail awaiting transport to Menard for his conviction concerning an unrelated abduction, Stark approached Deputy Miller to inform him that defendant had made statements implicating himself in the abduction and murder of Elizabeth West.

(2) On March 20, 1979, defendant told jailers he wanted to talk to a detective. Miller appeared, obtained a waiver of defendant's constitutional rights, and conducted an oral interview during which defendant admitted the abduction, assault, and murder of Elizabeth West. He promised a future written statement and to take Deputy Miller to Ruth Ann Jany's body, yet unfound.

(3) On March 21, 22, and 25, 1979, defendant implicated himself in both murders, promising to lead Deputy Miller to Ruth Ann Jany's body on Sunday, all for the purpose of delaying his departure for Menard so that Stark could make bail and return to help defendant escape, and Deputy Miller, feigning ignorance of the escape plan, pressured defendant to lead Deputy Miller to Ruth Ann Jany's body to justify delaying defendant's transfer to Menard.

(4) Stark's bond was reduced, at the request of an assistant State's Attorney, to $500 cash, and on March 21, 1979, Stark posted bail and was released at 6:40 p.m., soon after the first recorded interview with defendant.

(5) When the escape did not materialize, defendant recanted his prior statements, without revealing the escape plan to Deputy Miller.

The trial court held that the unusual facts of this case, including the escape scheme orchestrated through Stark's agency relationship with Deputy Miller, amounted to a type of police overreaching that could result in a false confession, that defendant's incriminating statements to Deputy Miller were involuntary, and that defendant is entitled to a new trial.

## Sanctions

Prior to the postconviction hearing, in an order filed September 28, 1999, the trial court, over the State's objection, granted defendant's motion for discovery. On October 12, 1999, the State filed a motion to vacate the order granting defendant's motion for discovery, and the

State also filed a petition to transfer the postconviction proceedings to the trial judge who had presided over defendant's plea proceedings in 1979.

On November 3, 1999, the State filed a motion for substitution of judge for cause, explaining why Judge Roger Scrivner was under a conflict of interest, was biased in favor of defendant, and was prejudiced against the State. On November 15, 1999, Judge Scrivner denied the State's motion to substitute judge, ordered that all evidence and police reports be produced to defendant, and ordered a deposition of Deputy Miller. The State filed a motion in the supreme court for a supervisory order directing Judge Scrivner to vacate his order of November 15 and to transfer the cause to another judge for a hearing on the motion to substitute. On December 21, 1999, the supreme court entered an order denying the motion for a supervisory order.

On February 23, 2000, defendant filed a motion seeking attorney fees for responding to the motions by the State. On June 15, 2000, Judge Scrivner entered an order wherein he found that the State's conduct in filing the motion to transfer to the original trial judge and the motion to vacate the order for discovery, while never requesting a hearing, thereby abandoned said issues and caused defendant's attorney a great waste of time and effort. Judge Scrivner also imposed sanctions in accordance with Supreme Court Rule 137 (155 Ill. 2d R. 137), because the motion for substitution of judge for cause was not well founded in fact or warranted by existing law and because the motions were filed to unnecessarily delay the proceedings and increase the cost of litigation for defendant. Judge Scrivner ordered the State's Attorney's office to pay attorney fees to defendant's attorneys in the total amount of $1,950.

On July 7, 2000, the State filed a motion to vacate the order granting sanctions, and on August 25, 2000, Judge Scrivner denied the State's motion. The State filed its timely appeal.

## ANALYSIS

### New Trial

Initially, defendant contends that he did not enter an *Alford* plea, *i.e.*, that the trial court had rejected his *Alford* plea, and that therefore he was subjected to a trial. We disagree.

■ At the guilty plea proceeding, defendant's counsel stated that although defendant was unwilling to concede facts admitting his guilt, defendant was in effect entering a guilty plea. The court admonished defendant in accordance with a guilty plea proceeding, *i.e.*, explained to defendant that he was waiving his right to a trial by jury and his right to cross-examine. The State presented evidence to establish the

factual basis for the guilty plea, in compliance with *Alford*. See *Alford*, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160 (although Alford stated that he had not committed the crime, the guilty plea was deemed valid where Alford entered his plea of guilty and the State presented a sufficient factual basis for the plea). The trial court, after recognizing that defendant had waived his right to a trial by jury in exchange for the State's waiver of its right to seek a death sentence, stated that it would proceed in the fashion of a bench trial, without evidence being presented by defendant or cross-examination by defendant. The trial court stated, "[I]n effect *** the [d]efendant *** would be pleading to the case." The court asked defendant if he, in effect, desired to plead guilty, and defendant answered in the affirmative. The State then presented lengthy evidence, by way of witnesses and stipulations, designed to satisfy the requirement in *Alford* that a strong factual basis be presented when a defendant wishes to plead guilty while maintaining his innocence. Defendant entered an *Alford* plea and was not subjected to a trial.

Although neither the State nor defendant addresses how the ramifications of defendant's *Alford* plea relate to defendant's contentions concerning his coerced confession, we refuse to proceed with our analysis as if defendant's confession had been offered into evidence at a trial. See *McMann v. Richardson*, 397 U.S. 759, 773, 25 L. Ed. 2d 763, 775, 90 S. Ct. 1441, 1450 (1970).

■ In Illinois, a voluntary plea of guilty waives all errors or irregularities that are not jurisdictional. *People v. Peeples*, 155 Ill. 2d 422, 490 (1993). "Issues waived by a defendant's plea of guilty include the admissibility of his or her confession." *Peeples*, 155 Ill. 2d at 491.

The Supreme Court has expressly held that a defendant's relinquishment of his right to challenge a confession is a valid bargaining point in plea negotiations. *McMann*, 397 U.S. at 768-71, 25 L. Ed. 2d at 771-74, 90 S. Ct. at 1447-49; *People v. Stice*, 160 Ill. App. 3d 132, 139 (1987). In *Brady v. United States*, 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970), *McMann*, 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441, and *Parker v. North Carolina*, 397 U.S. 790, 25 L. Ed. 2d 785, 90 S. Ct. 1458 (1970), the Court dealt at length with the effect of a plea of guilty on the later assertion of constitutional right violations.

Although in each case the Supreme Court refused to subject the defendant's plea of guilty to collateral attack on the ground that it was motivated by a constitutional violation prior to the guilty plea, *i.e.*, a coerced confession, we find the Supreme Court's analyses to be instructive. In *Brady*, the Court explained, "Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts

charged in the indictment." *Brady*, 397 U.S. at 748, 25 L. Ed. 2d at 756, 90 S. Ct. at 1468. The Court in *Tollett* explained that even if the circumstances relating to the constitutional violation were unknown at the time of the guilty plea, "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267, 36 L. Ed. 2d 235, 243, 93 S. Ct. 1602, 1608 (1973).

■ In the present case, unlike *Brady*, *McMann*, *Parker*, and *Tollett*, defendant did not solemnly admit in open court that he was in fact guilty of the offense with which he was charged. We therefore hold that if a defendant enters a guilty plea but maintains his innocence of the crime, as permitted by *Alford*, and the State's factual basis for the defendant's plea primarily concerns a confession, of which facts unknown at the time of the defendant's plea suggest coercion, the defendant may collaterally attack his guilty plea.

Accordingly, we now review defendant's claim that the St. Louis Post-Dispatch article in February 1999 alerted him to a previously unknown scheme between Deputy Miller and Stark to obtain defendant's confession and that the scheme rendered his confession involuntary.

■ In reviewing whether defendant's confession was voluntary, we must accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). We review *de novo* the ultimate question of whether the confession was voluntary. *In re G.O.*, 191 Ill. 2d at 50. In determining whether a statement has been voluntarily given, we must consider the totality of the circumstances. *People v. Martin*, 102 Ill. 2d 412, 426-27 (1984).

Certain interrogation tactics, in isolation or as applied to the unique characteristics of a suspect, are so offensive to a civilized system of justice that they must be condemned. *People v. Manning*, 182 Ill. 2d 193, 208 (1998). To determine if defendant's confession was voluntary, we must focus on the crucial element of police overreaching. *Manning*, 182 Ill. 2d at 208.

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320-21, 3 L. Ed. 2d 1265, 1270, 79 S. Ct. 1202, 1205-06 (1959).

■ A defendant's confession will be considered involuntary when the defendant's will was overborne at the time of his confession so that the confession cannot be deemed the product of a rational intellect and a free will. *People v. Foster*, 168 Ill. 2d 465, 476 (1995). "[P]olice are allowed to play on a suspect's ignorance, fears[,] and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990).

The State may not extort confessions by deliberate fraud or trickery. *People v. Smith*, 108 Ill. App. 2d 172, 180 (1969). Evidence that the accused was threatened, tricked, or cajoled into the waiver of his rights will, of course, show that the defendant did not voluntarily waive his privilege against self-incrimination. *Smith*, 108 Ill. App. 2d at 179; see also *Miranda v. Arizona*, 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629 (1966). " 'Trickery' involves affirmative acts of fraud or deceit." *Smith*, 108 Ill. App. 2d at 179. The confession must not result from deceptive interrogation tactics calculated to overcome the defendant's free will. *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001).

In *Spano*, the defendant had contacted a close childhood friend who was a recruit at the police academy, and the defendant implicated himself in the murder for which he was indicted. *Spano*, 360 U.S. at 317, 3 L. Ed. 2d at 1268, 79 S. Ct. at 1204. Bruno, the childhood friend, contacted his superiors with the information, and officials requested that Bruno falsely convey to the defendant that the defendant's contact had placed Bruno's job in jeopardy and that the loss of his job would be disastrous to his wife, his children, and his unborn child. *Spano*, 360 U.S. at 319, 3 L. Ed. 2d at 1269, 79 S. Ct. at 1204-05. After four sessions playing on the defendant's sympathies, the defendant succumbed to his friend's prevarications and agreed to make a statement to officials. *Spano*, 360 U.S. at 319, 3 L. Ed. 2d at 1269, 79 S. Ct. at 1205. The Court, considering the totality of the circumstances, held that the defendant's will was overborne by "official pressure, fatigue[,] and sympathy falsely aroused." *Spano*, 360 U.S. at 323, 3 L. Ed. 2d at 1272, 79 S. Ct. at 1207.

In the present case, the trial court found that with the knowledge of defendant's previous assertion of his right to remain silent, Deputy Miller collaborated with Stark to obtain defendant's confession to the underlying murders. Stark and defendant contrived the escape scheme, and in reliance on the escape scheme, defendant and Deputy Miller each "essayed strategic deception on the other": defendant making admissions, promising to lead Deputy Miller to the location of Ruth Ann Jany's body on Sunday, and delaying his departure for Menard so

that Stark could make bail and return to help defendant escape on Saturday; and Miller feigning ignorance of the escape plan and asking to be led to Ruth Ann Jany's body to justify delaying defendant's transfer to Menard, of which defendant was intensely fearful. Stark was rewarded for his persuasive tactics when his bond was reduced, and Stark posted bail and was released soon after Deputy Miller's first recorded interview with defendant. When defendant realized that he had been tricked by Stark, yet still unaware of the relationship between Deputy Miller and Stark, defendant recanted his prior statements to Deputy Miller. Deputy Miller's knowledge of the escape plan and his involvement in the deception were never recorded and never disclosed to the defense.

■ We find that the trial court's factual findings were not against the manifest weight of the evidence. Deputy Miller admitted that he and Stark had a history of Stark providing Deputy Miller with information in exchange for lenient consequences for Stark's illegal behavior. Deputy Miller admitted knowledge of the previous interrogation of defendant in which defendant asserted his right to remain silent. Even though Stark and Deputy Miller testified that Stark's placement in jail near defendant, and the coincidence of such placement, was the result of mere happenstance, Deputy Miller soon learned of Stark's deception of defendant concerning the escape scheme. Deputy Miller encouraged Stark to continue the interplay with defendant. Stark was ultimately rewarded when his charge was later reduced to misdemeanor theft. Defendant had an intense fear of returning to Menard. Stark was aware of that fear and utilized it to promote the escape scheme to persuade defendant to confess. Based on the totality of the circumstances, we conclude that defendant's confession was the result of deceptive interrogation tactics calculated to overcome defendant's free will at the time of his confession and that defendant's confession cannot be deemed to be the product of a rational intellect. The trial court correctly granted defendant a new trial, an authorized disposition under section 122—6 of the Post-Conviction Hearing Act (725 ILCS 5/122—6 (West 2000)).

## Sanctions

The State further argues that the circuit court was without authority to order sanctions against the office of the State's Attorney of St. Clair County because Supreme Court Rule 137 (155 Ill. 2d R. 137) is inapplicable to proceedings initiated under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 2000)).

■ Illinois Supreme Court Rule 137 provides in pertinent part as follows:

"The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion[,] or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law[;] and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." 155 Ill. 2d R. 137.

■ Section 122—4 of the Post-Conviction Hearing Act, regarding pauper petitions, provides, "A petitioner who is a prisoner *** who files a pleading *** that purports to be a legal document seeking post[ ] conviction relief *** against the State *** in which the court makes a specific finding that the pleading *** is frivolous shall not proceed as a poor person and shall be liable for the full payment of filing fees and actual court costs ***." 725 ILCS 5/122—4 (West 2000). Contrary to the State's assertion, section 122—4 does not prohibit the application of Rule 137 in postconviction proceedings. See also 725 ILCS 5/122—5 (West 2000) (regarding proceedings on a postconviction petition, this section provides, "The court may in its discretion make such order as to *** filing further pleadings *** as shall be appropriate, just[,] and reasonable and as is generally provided in civil cases").

■ Imposing sanctions pursuant to Illinois Supreme Court Rule 137 is within the sound discretion of the trial court, and the trial court's decision will not be disturbed by a court of review absent an abuse of discretion. *Wagener v. Papie*, 242 Ill. App. 3d 354, 363 (1993).

In imposing sanctions, Judge Scrivner held that the State's conduct in filing the motion to transfer to the original trial judge and the motion to vacate the order for discovery, while never requesting a hearing, thereby abandoned said issues and caused defendant's attorney a great waste of time and effort. Judge Scrivner also held that the motion for substitution of judge for cause was not well founded in fact or warranted by existing law and that the motions were filed to unnecessarily delay the proceedings and increase the cost of litigation for defendant. The trial court did not abuse its discretion in imposing sanctions against the State.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

CHAPMAN and MAAG, JJ., concur.