# Illinois Official Reports

## Appellate Court

*People v. Hardimon*, 2021 IL App (3d) 180578

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRIN C. HARDIMON, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-18-0578 |
| Filed<br>Modified upon<br>denial of rehearing | July 22, 2021<br><br>December 14, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 11-CF-124; the Hon. John P. Vespa, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Melissa A. Matuzak, of Chicago, for appellant.<br><br>Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Nick A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion. Justices Holdridge and Hauptman concurred in the judgment and opinion.[*]

**OPINION**

¶ 1      Defendant Darrin C. Hardimon was convicted of four counts of first degree murder and one count of unlawful possession of a weapon by a felon following a jury trial and sentenced to consecutive terms of imprisonment of 80 years and 14 years, respectively. He appealed. We vacate his conviction for unlawful possession of a weapon by a felon and affirm his conviction for first degree murder.

¶ 2                          I. BACKGROUND

¶ 3      The defendant, Darrin C. Hardimon, was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)) and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) for a February 2011 shooting death outside Club Apollo, a Peoria nightclub. A jury trial took place. The jury found the defendant guilty of first degree murder and unlawful possession of a weapon by a felon. The trial court sentenced him to 80 years' imprisonment for murder and 14 years' imprisonment for unlawful possession of a weapon by a felon with the terms to be served consecutively. This court reversed the defendant's convictions and remanded the case, finding defense counsel provided ineffective assistance. *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 39.

¶ 4      On remand, the defendant filed a motion to suppress, arguing he was arrested without a warrant and his subsequent statements should be suppressed. A hearing on the motion took place. The parties stipulated that Peoria police officers arrested the defendant on February 8, 2011, without either arrest or search warrants; the defendant was arrested at the home of his girlfriend, Whitney Evans; Evans would testify she did not consent to a search of her home; and Peoria detective Chad Batterham would testify that based on a "49" message, which is a law enforcement probable cause alert, he went to Evans's house to arrest the defendant, and Evans consented to a search of the premises.

¶ 5      An evidentiary hearing took place on the defendant's motion to suppress. Timothy Moore, an investigator for the Peoria County State's Attorney's Office, testified. In February 2011, he was a police detective with the City of Peoria Police Department in the criminal investigation division, violent crimes. Moore testified that he reviewed the police reports of the investigation from which he learned the following. There was an anonymous tip that the shooter entered a 1999 black Mitsubishi Eclipse with a certain license plate number. The car belonged to Anthony Carter, who said he loaned the car to T.C. Driver. When Driver picked up the car from Carter, Driver's friend named "Scoob" or "Scooby" was with him. Driver was interviewed on February 7, 2011. Moore did not participate in the interview. Driver said he borrowed Carter's car and picked up Scoob, whom he identified with a photograph as the defendant. Driver and the defendant went to Club Apollo around 11:30 p.m. or midnight the

_____

[*]Justice Hauptman was added to the panel for review of defendant's petition for rehearing.

night of the shooting. The defendant argued with the victim. When Driver and the defendant were leaving the club, the defendant again exchanged words with the victim, pulled out a pistol, pointed it at the victim, and fired two rounds. As Driver walked to the car, which he had backed into the parking stall, he heard more gunshots. He then entered the car, the defendant thereafter also entered the car, and they drove out of the parking lot. After interviewing Driver, the police issued a "49" probable cause message for the defendant. Moore further testified that Early Johnson, a security guard at Club Apollo, told officers that he broke up a fight in the men's bathroom between two individuals, one of whom was the victim, and escorted them out of the club.

¶ 6 On cross-examination, Moore explained that a "49" message was "an internal numeric code that law enforcement has to send a message to other law enforcement that somebody is wanted for questioning." A "49" message does not always mean there is probable cause. The messages issue from the police department, not from the state's attorney's office or from a magistrate. Moore further testified that Johnson said at the time he escorted the men out of the club that he did not know the individuals, describing them only as black men. No one at the nightclub or in the group standing outside the club identified the defendant as either the participant in the bathroom altercation or as the shooter.

¶ 7 The club's surveillance camera captured the shooting. Moore watched the video recording after the defendant was arrested and prior to a second interview of Driver, which Moore conducted. During the interview, Driver offered specific facts, named the defendant as Scoob, and identified him from a photograph. Moore agreed the video showed an individual exiting a parked car, walking up to the front of the club, and shooting the victim. The video version of events stood in contrast to Driver's version of the events. According to Driver, the defendant shot the victim as he and Driver left the club. At that point, there was no forensic evidence to connect the defendant to the shooting. On redirect examination, Moore said the video showed the taller man entering the driver's seat of a vehicle. He described Driver as taller than the defendant and identified the vehicle as a Mitsubishi Eclipse.

¶ 8 The parties agreed that the video of the first interview with Driver should be admitted and that the court should review it. The probable cause hearing was continued to and concluded on April 11, 2018. The trial court found that Driver was an occurrence witness who was known to the police, meaning that he provided information face-to-face, not anonymously, and who recounted what he witnessed. The court further found that there was probable cause for the "49" message and the defendant's arrest. The trial court denied the motion to suppress.

¶ 9 The defendant moved to sever the murder and weapon charges. The trial court denied his request for two separate trials but agreed to bifurcate the charges. The defendant also requested that the court order the Peoria Police Department to have retired detective Steven Garner served or provide an address for him. According to the defendant, he had served Garner's subpoena at the Peoria Police Department, but Garner failed to appear as ordered. On the court's request, counsel for the City of Peoria appeared and explained that the subpoena for Garner that was served on the police department "fell between the cracks." Defense counsel was provided an address for Garner at his sister's house; apparently, he had left the state with no further forwarding address. Defense counsel served a subpoena at that address via certified mail, the sheriff's department, and a private process server.

¶ 10 The jury trial began on July 24, 2018. Because counts III and IV were dismissed at the first trial, the State proceeded only on counts I, II (first degree murder), and V (unlawful possession

- 3 -

of a weapon by a felon). Several law enforcement officers testified for the State that large crowds often gathered outside Club Apollo at closing time. Because there were often fights, the police patrolled the area in order to disperse the crowds. At approximately 3:50 a.m. on February 6, 2011, officers heard multiple gunshots, with reports indicating 7 to 10 gunshots followed by 7 to 10 additional gunshots. Officers responded to the nightclub where they found Jerrell Hartwell lying on the ground unresponsive in front of the club, a victim of multiple gunshot wounds. There were approximately 30 people in front of the club and another 70 or so gathered in the parking lot; the scene was chaotic. Club patrons were running around the lot and leaving in vehicles. The club's clientele was predominately black with equal number of men and women between the ages of 21 and 35. No one identified the shooter. No one identified the defendant as being present.

¶ 11    An officer at the scene was approached by Demetrius Easley, a security guard at Club Apollo, who handed him a piece of an envelope and said the paper came from a patron who had left the club. Written on the envelope was the following: "Black Eclipse. L, as in Lincoln, 101306" and "Guy had on a Black hat, Black shirt." The officer added "B/M", meaning black male. Easley told the officer that the person who gave him the note said the "shooter had gotten into a car parked on Jefferson Street." Seventeen shell casings and bullet fragments were located near the nightclub entrance and in the parking lot, and bullet strikes were found on the building. The evidence was submitted to the state crime lab. There were no usable fingerprints discovered on the casings. Three bullets were removed from the victim's body at the autopsy. No firearms evidence was discovered after the Mitsubishi Eclipse was examined. Photographs of the passenger side door did not indicate whether the door handle was broken but the area around it was dented.

¶ 12    Telekia Lyles testified. She had been at Club Apollo on the night in question with friends to celebrate her sister's birthday. She was the designated driver. She left the club before closing to warm up her car in the parking lot. Lyles heard gunshots, and she and her friends in the car ducked. There was a pause, she looked up and saw the victim in a fetal position. The shooter had his back to her and kept shooting until he ran out of bullets. She did not see the shooter's face. He turned toward her car, and she again ducked. She looked up and saw the shooter walk by her car on the passenger side. He walked to a car that was parked directly across from her facing the club and entered the passenger side. The car's headlights came on, she ducked again, and the vehicle left. She was able to write down the license plate number. When the crowd in the lot dispersed, she called the security guard over and gave him the envelope on which she recorded the license plate number.

¶ 13    On cross-examination, Lyles described the lot as poorly lit. The front of her car was facing away from the front of the club. She was preoccupied with changing from her dress boots to snow boots. After the shooting, people were running and leaving the scene. She was scared and too frantic to provide a time estimate of the shooting. She did not recognize the shooter or identify the defendant as the shooter. She could have heard more than 10 gunshots. She did not see the driver enter the Mitsubishi. She could not see into the vehicle.

¶ 14    Carter testified that he owned a 1999 black Mitsubishi Eclipse that he loaned to Driver on February 5, 2011. The defendant was not with Driver when he picked up the vehicle. Driver returned the car within 24 hours. Carter did not find a gun in it.

¶ 15    Johnson testified. He was head of security at Club Apollo. He broke up a verbal altercation in the men's bathroom around 2 a.m. Four men were in the bathroom with two of them arguing.

The victim was one of the men involved in the argument. An older man was trying to calm down the defendant. The victim left the bathroom, and Johnson attempted to escort the defendant out of the club. Instead, the defendant entered another area when Johnson was called to quell a physical altercation elsewhere in the club. Johnson later found the defendant and escorted him out, along with the older man from the bathroom, at approximately 2 or 2:30 a.m. Johnson made an in-court identification of the defendant as the other man involved in the altercation. Johnson had previously identified the defendant in a lineup at the police station.

¶ 16 Johnson further testified that as the defendant was leaving the club, he said, "He'll come back and he'll light this bitch up." The defense objected, asserting the statements were inadmissible lay witness opinion testimony. The trial court overruled the objection. Johnson identified the phrase as street vernacular, with which he was familiar, and explained, "It means there's going to be some gun play." On cross-examination, when confronted with his testimony from the first trial where he said that the defendant stated, "I'll air this bitch out," Johnson stated that he could have been mistaken in his current testimony, but he was not mistaken in his initial testimony. Johnson explained that both statements meant the same thing.

¶ 17 Discussion took place between the trial court and the parties regarding the video of the defendant's police interview and this court's instructions regarding its admission as set forth in the order determining the prior appeal. See *id.* The State sought to play the video to the 28:35 mark. The defense sought to stop the video at the 25:46 mark. The trial court noted that this court determined that around the 30-minute mark, "the interview shifts from a conversational tone to accusations" and agreed with the State that the video should play until the 28:35 mark. See *id.* ¶ 36.

¶ 18 The defendant's video statement to Moore and Garner was admitted and played through the 28:35 mark. The video established that the defendant stated the following. The night the shooting took place, "Unc," whom he later identified as Driver by a photograph, picked him up at his girlfriend's house around 11 p.m. Driver was driving a black, two-door vehicle that belonged to the defendant's cousin, Carter. He identified Carter from a photograph. The defendant and Driver arrived at Club Apollo around 11:30 p.m. They first sat at the bar and then played pool. He did not argue with anyone at the club. He and Driver were together at the club. Neither man went to the restroom and nothing unusual happened. After last call around 3 a.m., they left the club to warm up the car. A small group of people were gathered in front of the nightclub. He and Driver were sitting in the car when they heard gunshots and saw the crowd disperse. They left the parking lot as the police were arriving.

¶ 19 The State rested, and a sleeping juror was replaced with an alternate juror. The defendant moved for a directed verdict. The trial court denied his motion, and the defense commenced its case.

¶ 20 The sole witness for the defense, Carter, the Mitsubishi owner, testified. The passenger side door of the vehicle did not work after he broke it in 2006. The door was missing a handle and did not open from either the outside or the inside. The only way to enter the passenger side was through the window or the driver's side door. On rebuttal, the State presented a certified copy of title and the registration record for the Mitsubishi, which showed Carter purchased it in June 2010.

¶ 21 Closing arguments took place. The State began by saying, "I'll light this place up." It replayed the surveillance video capturing the shooting and told the jury that the defendant admitted he was in the passenger seat of the Mitsubishi and the video showed that he was. The

defense argued that the video was unclear and neither the car nor its occupants could be identified. On rebuttal, the State returned to the video, reiterating that the defendant himself said he was in the passenger seat of the Mitsubishi.

¶ 22 Following deliberations, the jury returned a guilty verdict on one count of first degree murder. The court then informed the jury it would need to consider the additional charge of unlawful possession of a weapon by a felon. The State presented a certified copy of the defendant's prior conviction. The jury found the defendant guilty of the additional charge.

¶ 23 The defendant filed posttrial motions to set aside the verdict and for a new trial, both of which were denied. Sentencing ensued, and the trial court imposed sentences of 80 years' imprisonment for first degree murder, which included a 25-year enhancement, and 14 years' imprisonment for unlawful possession of a weapon by a felon, with the sentences to be served consecutively. The defendant moved to reconsider the sentence, which the trial court denied. The defendant timely appealed.

¶ 24                                    II. ANALYSIS

¶ 25 The defendant raises several issues on appeal. He challenges his conviction for unlawful possession of a weapon by a felon, his arrest resulting from the "49" message, the denial of his motion to suppress, the admission of opinion testimony and a portion of the defendant's interrogation video, and the effectiveness of trial counsel.

¶ 26 We first address whether the defendant's conviction for unlawful possession of a weapon by a felon should be vacated. The defendant argues that his conviction must be vacated because the predicate conviction on which the unlawful possession charge was based was entered under a void statute. The State concedes error and agrees that the defendant's conviction should be vacated.

¶ 27 In *People v. Aguilar*, 2013 IL 112116, ¶ 22, the aggravated unlawful use of a weapon statute under which the defendant was convicted in 2008 was declared unconstitutional on its face. See 720 ILCS 5/24-1.6(a)(1) (West 2008). In *In re N.G.*, 2018 IL 121939, ¶ 50, the court determined that convictions based on statutes found facially unconstitutional are void *ab initio*. Whether a conviction may serve as a predicate offense is a question of law this court reviews *de novo*. *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 29.

¶ 28 In deciding the defendant's first appeal, this court rejected the defendant's constitutional claim regarding his unlawful possession of a weapon by a felon conviction. *Hardimon*, 2017 IL App (3d) 120772, ¶ 44. Relying on *People v. McFadden*, 2016 IL 117424, this court found that the defendant had not "independently attained reversal or vacatur of the predicate offense" and the conviction was not unconstitutional or subject to vacatur. *Hardimon*, 2017 IL App (3d) 120772, ¶ 44. The decision was issued prior to the supreme court's decision in *N.G.*, 2018 IL 121939, ¶ 84, which overruled *McFadden*, in relevant part, finding it unconstitutional for a prior conviction for aggravated unlawful use of a weapon to serve as predicate offense. Accordingly, based on *Aguilar* and *N.G.*, we agree with the parties and find the State could not use the defendant's prior conviction for aggravated unlawful use of a weapon as the underlying felony to support his conviction for unlawful possession of a weapon by a felon. We thus vacate his conviction for unlawful possession of a weapon by a felon and the 14-year sentence imposed by the trial court.

¶ 29    The next issue we consider is whether the trial court allowed improper opinion testimony. The defendant challenges the testimony of Johnson, the security guard, concerning the statement the defendant allegedly made when he exited the club, that he was going to "come back and he'll light this bitch up." Johnson testified that the defendant's statement meant "there's going to be some gun play," which defendant argues constituted improper opinion testimony. We disagree.

¶ 30    The testimony of a lay witness

> "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

A witness's testimony must be based on personal knowledge and should not be an opinion or conclusion based on another's out-of-court statement. *People v. Holveck*, 141 Ill. 2d 84, 105-06 (1990) (citing *People v. Linkogle*, 54 Ill. App. 3d 830, 833 (1977)). A lay witness may not generally offer an opinion about the meaning of another person's out-of-court statement. *People v. Jackson*, 2013 IL App (3d) 120205, ¶ 21. This court reviews a trial court's decisions regarding the admission of evidence for an abuse of discretion. *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 21.

¶ 31    Johnson testified that as he escorted the defendant out of the club, the defendant said that he would "light this bitch up." Johnson explained that he was familiar with street slang and knew the meaning of the phrase. He understood the comment to mean that there would be some "gun play." We consider that Johnson's testimony was rationally related based on his perception, that is, his familiarity with street vernacular. The statement was helpful to the determination of the fact of the defendant's guilt in that there was, in fact, some "gun play." The statement was not based on scientific, technical, or specialized knowledge but rather on Johnson's experiences at Club Apollo. As such, the statement was properly admitted. We find the trial court did not err in allowing it.

¶ 32    The next issue we review is whether the defendant was prejudiced by part of his interrogation video played for the jury. The defendant argues that the trial court allowed portions of the video that this court found should be excluded as prejudicial. He asks this court to reverse and remand for a new trial where only relevant portions of the video are shown to the jury.

¶ 33    Evidence is admissible when relevant to an issue that is in dispute and where its probative value is not substantially outweighed by its prejudicial effect. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000). Relevant evidence tends to make the existence of a fact of consequence more or less probable. *Id.* at 115. Where the prejudice outweighs the probative value, the evidence should be excluded. *Id.* at 114-15. "[A] police officer's opinion statement regarding the ultimate question of fact possesses significant prejudice as the officer is a recognized authority figure." *Hardimon*, 2017 IL App (3d) 120772, ¶ 35. This court reviews a trial court's decisions regarding the admission of evidence for an abuse of discretion. *Romanowski*, 2016 IL App (1st) 142360, ¶ 21.

¶ 34    In the first appeal, this court found that trial counsel was ineffective for failing to move to redact the interrogation video. *Hardimon*, 2017 IL App (3d) 120772, ¶ 39. In the fact section of the opinion, the court stated that "[a]pproximately 26 minutes into the interview, [the

- 7 -

detectives] confronted" the defendant about the evening's events. *Id.* ¶ 19. In its analysis, the court noted that "[a]round the 30-minute mark," the interview turned from conversation to accusations. *Id.* ¶ 36. The court reasoned that the statements after the first third of the video were not relevant; the defendant did not change his statement or admit to the offenses, and the detectives disparaged the defendant as a " 'cold-blooded' murderer." *Id.* ¶ 38.

¶ 35 At the second trial, the defendant wanted the videotape stopped at the 25:46 mark and the State wanted it played until the 28:35 mark. The court and the parties discussed the video and this court's decision regarding it. The trial court stated that this court determined that "approximately 20 minutes of the video contained the defendant's relevant admissions about his location at the time of the shooting" and the rest consisted of prejudicial statements. See *id.* ¶ 34. The trial court then determined that this court said the "bad stuff started around the 30-minute mark" and that the reviewing court considered 20 minutes of the video contained relevant evidence.

¶ 36 At the 25:53 mark, the police begin to confront the defendant with their theory of the case and the evidence that would be used against him. During the roughly three-minute period of the video at issue, the detectives make a couple statements suggesting that defendant argued with the victim in the bathroom and continued the argument by later shooting the victim outside the nightclub. They insisted that the defendant argued with the victim in the bathroom. They informed him that an eyewitness identified the shooter as entering the Mitsubishi. The trial court found those statements admissible as allowable interrogation techniques. See *id.* ¶ 38 (noting that the police may use noncoercive techniques during an interrogation (citing *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002))). We agree. The trial court differentiated the statements this court found prejudiced the defendant from the comments at issue in the challenged three-minute period. Prior to the 28:35 mark, although the officers accused the defendant of the offense, they had not yet begun to goad him into confessing to it. In contrast, during the excluded portions of the video, the officers made statements that could inflame the jury's passions and were not relevant. The statements at issue here remained relevant, and their relevancy outweighed any resulting prejudice. For example, the defendant's statement made at the 28:10 mark where he acknowledges that he was in the Mitsubishi was relevant to the State's case. The trial court's decision to play the video long enough to include that comment was proper.

¶ 37 Even if we were to find that the trial court's decision to admit the challenged three minutes was error, the error would be harmless. Unlike the remainder of the video, prejudicial statements did not pervade this part of the video. When we addressed this issue in the defendant's first appeal, we were confronted with the entirety of the interrogation video, the latter portion of which contained irrelevant comments from the detectives that did prejudice the defendant. Furthermore, the issue was counsel's ineffective assistance and the substantial prejudice to the defendant as a result of counsel's deficient performance. Here, at issue was the propriety of approximately three minutes of the video and whether the defendant was prejudiced by its publication to the jury. We find the three minutes at issue in this appeal do not rise to the same level of prejudice as the substantial portion of the video that was previously held inadmissible by this court. See *id.* ¶ 36.

¶ 38 The next issue is whether the trial court erred in denying the defendant's motion to suppress. The defendant argues that his statements should be suppressed because the police lacked probable cause to arrest him without a warrant.

¶ 39    The police may arrest a person when (a) the officer has a warrant, (b) he has reasonable grounds to believe a warrant has been issued for the person's arrest, or (c) "[h]e has reasonable grounds to believe that the person is committing or has committed an offense." 725 ILCS 5/107-2(1)(a)-(c) (West 2018). To determine whether a warrantless arrest satisfies the probable cause requirement, the court decides "whether 'a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " *People v. Tisler*, 103 Ill. 2d 226, 237 (1984) (quoting *People v. Wright*, 41 Ill. 2d 170, 174 (1968)). Where probable cause exists, the arrest is lawful, and evidence obtained from the arrest is admissible. *Id.* Where the arrest is unlawful, the remedy is to suppress the fruit of the unlawful arrest, including postarrest statements. *People v. Johnson*, 237 Ill. 2d 81, 92 (2010) ("evidence obtained as a result of an illegal arrest may be subject to the exclusionary rule and inadmissible"). This court employs a two-part standard in reviewing a trial court's denial of a motion to suppress. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The court's factual findings are accepted unless they are manifestly erroneous. *Id.* Whether the motion to suppress was properly denied is reviewed *de novo. Id.*

¶ 40    The trial court determined that Driver's first statement to the police was sufficient to establish probable cause to issue the "49" message and arrest the defendant. It was correct. At the time of the defendant's arrest, the police knew that there had been a shooting, an anonymous person provided the description and license plate of the car that the shooter had entered after the shooting, and the license plate revealed Carter as the vehicle's owner. Carter told the police he loaned the vehicle to Driver, who told the police that he was at Club Apollo with the defendant. Johnson told officers he had broken up a verbal altercation in the bathroom between the victim and a dark-complected man. He also said the same man argued with the victim in the bathroom and later shot him when they left the club when it closed. Driver also told the police he witnessed the altercation in the bathroom, identifying the defendant as a participant. According to Driver, he and the defendant readied to leave the nightclub after the lights came on around 3:15 a.m., at which point patrons were still lingering over their last drink. Driver said he and the defendant stayed until "closing" but did not specify a time. According to Johnson, the club closed at 4 a.m. When Driver and the defendant walked out of the club, they encountered the victim and others loitering outside the club's entrance. The shots were fired at 3:50 a.m., which corresponds with Driver's sequence of the events. Although Driver said the defendant shot the victim upon leaving the nightclub, which does not match the shooter's location in the video, the majority of Driver's recollection aligns with the other evidence and provides indicia of reliability.

¶ 41    Driver's third-party statements were verified by other facts known to the police at the time, including what Carter and Driver told them. The trial court viewed the video of Driver's initial statement to the police and found him credible. The surveillance video from the club largely supported Driver's version of events in the parking lot. It showed the shooter pointing his weapon and firing at the victim, walking through the parking lot, and entering the Mitsubishi. It also showed that the individual who entered the driver's side of the Mitsubishi was taller than the person who entered the passenger compartment. Because Driver had identified the defendant, the police were aware of the defendant's vital information, including his weight. Shell casings were located by the front door of the nightclub, which matches Driver's narrative that the defendant encountered the victim upon leaving. The information provided by Lyles, the witness who wrote down the license plate number of the Mitsubishi, also supported

Driver's statement and corresponded with the parking lot video. Although she misidentified where the vehicle parked, she witnessed the shooter enter the passenger side of the Mitsubishi. Considered together, this information was sufficient to establish that a reasonable person would believe it was likely that the defendant committed the shooting. We find the police had probable cause to arrest the defendant.

¶ 42 We must now determine the propriety of the warrantless arrest. Warrantless arrests are constitutionally prohibited unless they fall within a recognized exception, such as when exigent circumstances justify a warrantless entry. *People v. Foskey*, 136 Ill. 2d 66, 74 (1990). For a warrantless entry to be justified, there must be probable cause and exigent circumstances. *People v. Harris*, 104 Ill. App. 3d 833, 842 (1982). To decide if exigent circumstances existed, the court considers what the police knew at the time they acted and whether their actions were reasonable. *People v. Payton*, 317 Ill. App. 3d 909, 913-14 (2000). The following factors are used to determine whether exigent circumstances justify a warrantless entry: (1) whether the offense being investigated was recently committed; (2) whether the officers deliberately or unjustifiably delayed during a time they could have obtained a warrant; (3) whether a grave offense, particularly one of violence, is involved; (4) "whether the suspect is reasonably believed to be armed"; (5) whether the police were acting upon a clear showing of probable cause; (6) whether there was a likelihood of escape if the suspect was not swiftly apprehended; (7) whether there was a strong reason to believe the suspect was at the premises to be searched; and (8) whether the police entry, although nonconsensual, was made peacefully. *People v. White*, 117 Ill. 2d 194, 216-17 (1987). "These 'exigency factors' need only be satisfied on balance." *People v. Morrow*, 104 Ill. App. 3d 995, 1004 (1982) (citing *People v. Thompson*, 93 Ill. App. 3d 995, 1005 (1981)).

¶ 43 To effectuate the defendant's warrantless arrest, the State needed to establish probable cause and that law enforcement acted under exigent circumstances. We consider that the State carried its burden. As we have found probable cause existed, we must consider whether the exigency factors supported the warrantless arrest. The first factor is whether the offense was recently committed. The shooting happened in the early morning hours on February 6, 2011. Carter and Driver were interviewed on February 7, 2011. Based on information gleaned, in part, from the Carter and Driver interviews, the defendant was arrested on February 8, 2011. In approximately 48 hours after the shooting, the police identified, located, and arrested the defendant; we conclude that when the defendant was arrested, the offense had been recently committed.

¶ 44 The next factor is whether there was an unjustified or deliberate delay during which time the officers could have obtained a warrant. The investigatory timeline indicates the police did not delay unjustifiably or deliberately. Driver was interviewed on February 7 and identified the defendant, who was arrested at approximately 7 a.m. on February 8. The police followed the trail of leads about the shooting, starting with the tip identifying the Mitsubishi, which revealed Carter as the owner, who informed them that he loaned the car to Driver. In turn, Driver said the defendant rode with him to Club Apollo, and he implicated the defendant in the shooting. At that point, the police found and arrested the defendant. Although there was a 24-hour period between the Carter and the Driver interviews and defendant's arrest, under the circumstances here, we find there was no unjustifiable or deliberate delay. Importantly, the exigency factors need only be satisfied "on balance." See *Morrow*, 104 Ill. App. 3d at 1004.

¶ 45    The third factor is the gravity of the offense and whether it was a violent offense. Here, the offense was grave, involved a shooting, and resulted in a death. The seriousness and violent nature of the offense favored exigency in order to protect the community from a dangerous individual. The fourth factor, whether the suspect was believed to be armed, supported exigency as the victim was shot to death and no weapon was discovered at the scene or in the Mitsubishi. The fifth factor is whether the police were acting on a clear showing of probable cause. As discussed above, the police had probable cause to arrest the defendant. The sixth factor, the likelihood of escape, is neutral as no evidence was presented. The seventh factor, whether there was a strong reason to believe the defendant was at Evans's house, supports exigency. Driver picked him up and dropped him off there. The police knew of the defendant's whereabouts. The eighth and final factor is whether the police entry was peaceful despite being executed without consent. Here, entry by the police was peaceful. Evans opened the door; the police entered and arrested the defendant.

¶ 46    We conclude that these factors support the presence of exigent circumstances, which justified the warrantless arrest of the defendant. The defendant also asks us to invalidate his arrest as unlawful on the basis that use of the "49" message issued to arrest him was unconstitutional. Because of our finding that the police had probable cause to arrest and there were exigent circumstances justifying the warrantless arrest we do not reach the defendant's claim that use of the "49" message was unconstitutional. *People v. Lee*, 214 Ill. 2d 476, 482 (2005) (constitutional question should not be considered when other grounds exist to decide the case).

¶ 47    The final issue is whether trial counsel was ineffective for failing to question Johnson about his description of the individual arguing with the victim in the bathroom. The defendant also submits that counsel should have secured the detective who interviewed Johnson and that counsel's failure to question Johnson about the discrepancies in his descriptions and to compel the detective's appearance amounted to defective performance and served to prejudice him.

¶ 48    To sustain a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Effective assistance of counsel includes counsel's duty to reasonably investigate or determine that an investigation is not necessary. *Id.* at 691. Counsel does not perform deficiently when he fails to pursue an apparently unavailable witness. *People v. Williams*, 147 Ill. 2d 173, 247 (1991). This court defers to a trial court's findings of fact unless they are against the manifest weight of the evidence but reviews *de novo* the ultimate question of whether counsel was ineffective. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006).

¶ 49    The defendant complains that trial counsel did not question Johnson about the discrepancy in him identifying the person involved in the bathroom altercation as "dark complected" in his interview with Garner. At the first trial, Garner testified that Johnson described the defendant as having a dark complexion. Johnson testified he would not have called the defendant "dark-skinned." Garner himself described the defendant's skin tone as "medium." Garner did not testify at the second trial. During the second trial, Johnson identified the defendant as the man who argued with the victim in the Club Apollo bathroom. He also testified that he identified the defendant in an in-person lineup several days after the shooting. Johnson did not waiver in identifying the defendant as the person involved in the bathroom altercation. The discrepancy in Johnson's description of the defendant's skin tone as revealed in the first trial was offset by

- 11 -

his positive identifications of the defendant. Although Johnson explained that he would not have described the defendant as dark-skinned, he unequivocally identified the defendant. We find that counsel's failure to question Johnson about his description of the defendant did not constitute ineffective assistance.

¶ 50    We further find that defense counsel's failure to secure Garner as a trial witness did not amount to deficient performance and was not ineffective assistance. Defense counsel sought Garner's attendance at trial, albeit unsuccessfully, due in part to Garner's retirement from the police force and his subsequent relocation. Counsel lacked Garner's personal contact information. He contacted the police department and was informed regarding the process to serve a subpoena to an officer. Defense counsel followed that protocol and served the subpoena on the police department, where it was signed and certified as received. When Garner failed to appear for trial, the defendant sought a continuance to secure his presence as a necessary witness. The court allowed a one-week continuance and ordered the employee from the police department who signed for the subpoena to appear and explained what happened with it.

¶ 51    Heather Calvert, counsel for the City of Peoria, appeared along with the records clerk. Calvert explained per the standard procedure, the clerk put the subpoena in the mail slot for the administration. Calvert attempted to follow up about the subpoena with defense counsel's office but admitted the subpoena "fell between the cracks." Calvert stated that both parties now had Garner's address. Defense counsel stated that he served a subpoena at the address provided via the sheriff, private process server, and certified mail. While discussing Garner's attendance, the State offered that the address provided defense counsel was Garner's sister's residence and Garner had retired to Florida without a forwarding address. The court noted that the State had been unsuccessful in securing Garner's attendance in "a whole bunch of other cases." Defense counsel agreed that the trial should begin the following week regardless of whether Garner's appearance could be secured.The trial court found that defense counsel "did everything he could and should have done" to secure Garner as a witness. We agree and find counsel's failure to further pursue Garner did not amount to ineffective assistance of counsel.

¶ 52    In summary, we vacate the defendant's conviction for unlawful possession of a weapon by a felon. We find the trial court properly allowed the security guard to opine on the meaning of street vernacular and the State to play the video of the defendant's interrogation to the 28:35 mark. We further find that the trial court did not err when it denied the defendant's motion to suppress as the police had probable cause to arrest and exigent circumstances justified the arrest without a warrant. We decline to determine whether the "49" messages are constitutional. Finally, we find that trial counsel was not ineffective.

¶ 53                            III. CONCLUSION

¶ 54    For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed in part and vacated in part.

¶ 55    Affirmed in part and vacated in part.